## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CR-20648-SCOLA/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

GAL VALLERIUS,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

This matter comes before the Court on a Motion to Suppress Statements and Physical Evidence filed by Defendant GAL VALLERIUS ("Defendant" or "Vallerius") on March 19, 2018. [D.E. 23]. The Government filed a Response in Opposition to the Motion on April 2, 2018 [D.E. 29], and an evidentiary hearing took place on April 18, 2018. Having carefully considered the motion and the opposition thereto, the arguments of counsel, the testimony of the witnesses at the hearing, the exhibits admitted into evidence and the legal authorities relevant to the dispute, the Court concludes that Defendant's Motion should be **DENIED**.

### I.    FACTUAL BACKGROUND

The events giving rise to Defendant's arrest and the underlying criminal complaint involve Defendant's alleged use of the "dark web" to facilitate international

narcotics transactions. An extensive discussion of what, exactly, the dark web is and who uses it is unnecessary for purposes of this Report; stated as simply as possible, however, it is a means by which individuals use special programs to effectively "hide" their unique internet protocol ("IP") address and obtain two-way anonymity to conceal one's browsing activity. According to the Government, individuals utilize the two-way anonymity the dark web affords to create online marketplaces dedicated to various illicit activities, including the purchase and sale of controlled substances.

One of the websites being investigated by authorities is known as the "Dream Market." The website allows individuals to create online advertisements offering various narcotics for sale, to which other members can respond and seek to purchase the drugs for a price set by the offering member. Payment for the illicit purchases are made through the use of Bitcoin and other cryptocurrencies, which add an additional layer of anonymity to the transaction and conceal the identities of the accounts from which the cryptocurrency payments originate.

Vallerius came to the Government's attention because of his active role within the Dream Market. The Government alleges that Defendant frequented the site using the moniker "OxyMonster," where he was listed as a controlling administrator. The Government claims that Vallerius moderated the forums and provided advice to other members about the online drug trade. In connection with his role as a "senior moderator," Defendant also sold controlled substances to other members using the website, receiving payment for these sales through the use of a Bitcoin "tip jar," or electronic depository.

It was through this tip jar that law enforcement officials became aware of Vallerius' true identity. After locating the Bitcoin depository allegedly belonging to the user "OxyMonster," agents tracked several incoming payments and outgoing deposits from the tip jar to various "wallets" controlled by Vallerius. Agents also cross-checked posts made by OxyMonster on the Dream Market forum with social media accounts belonging to Vallerius. Authorities determined that the writing style and syntax of the Dream Market posts made by OxyMonster matched those written by Defendant on his social media accounts and, equipped with this information, connected Defendant to his dark web persona.

Special Agent Lilita Infante of the United States Drug Enforcement Agency ("DEA") assisted in the investigation of Defendant's online activities and testified at the hearing in support of the Government's opposition to the Motion to Suppress. According to Infante, after the DEA linked the online persona of "OxyMonster" to Vallerius, she contacted members from Homeland Security Investigations ("HSI") to determine whether Vallerius might be travelling to the United States. HSI informed Infante that Defendant would be entering the country on August 31, 2017, roughly one week from the date she requested the information from HSI. Based on this information, Infante asked that Vallerius be "flagged" and pulled aside at the airport upon his arrival to customs.[1]

---

[1]      Infante stated that she did not know what Vallerius would be carrying with him, but testified that in her experience users of the dark web often conduct their business on personal laptop computers. Thus, she hoped that a search of Defendant's belongings upon his entry into the country might reveal additional links between Vallerius to his suspected Dream Market activities.

On August 31, 2017, Mr. Vallerius arrived in Atlanta from Paris, France on Delta Flight 83. Defendant entered the customs area and approached the "primary" inspector, who is tasked with examining passports and checking entrants' customs forms. HSI Special Agent Stephen Lewis, the duty agent assigned to the airport at that time, instructed the primary inspector to notify Defendant he had been picked for secondary inspection in accordance with Agent Infante's request the week prior. The primary inspector referred Defendant to secondary inspection, which Lewis described as a "working area" that allows Custom and Border Patrol ("CBP") officers to conduct "more detailed and thorough" examinations of a passenger's bags. Defendant and his wife were then asked to remove their baggage from the secondary carousel and "claim ownership" of their belongings, which they did without issue.

The officers on scene then requested that the bags be opened, and Lewis asked if Vallerius had been traveling with any electronic devices. Defendant acknowledged he possessed a laptop computer, a cell phone, and an iPad tablet. Agent Lewis asked whether the electronic devices were password-protected and Defendant answered in the affirmative. Lewis told Defendant that he would need the passwords to the electronics because the devices were subject to routine inspection at the border. Lewis testified that he told Defendant that border patrol agents would be searching for "contraband [and other] evidence of criminal activity," which included child pornography. According to Lewis, Defendant provided his passwords "without hesitation," and the electronic devices were removed from Defendant's possession. Lewis took the computer, tablet and phones to DEA agents from the Miami field office

who were waiting in what he described as a "seizure room." The agents used the passwords to gain access to the computer and conduct a search of its contents. While this occurred, Lewis engaged in "small talk" with Defendant.

According to Lewis, the DEA agents notified him that they had found information on the laptop that linked Vallerius to the Dream Market.[2] Specifically, the agents located a Bitcoin "wallet" on the laptop that purportedly could be traced to the OxyMonster account. The agents on scene believed the wallet required a password, so Lewis returned and requested that information from Vallerius. Defendant informed Lewis that the wallet did not require a password.[3] Lewis then moved Vallerius to a conference room within his office, and informed Defendant that he was being placed under arrest.[4] Lewis and the DEA agents advised Defendant of his *Miranda* rights and attempted to question him about the information obtained during the search of his laptop. Vallerius indicated he wished to consult with an attorney and at that point agents stopped the interview.

Based on the information obtained in the search of Defendant's computer in Atlanta, a search warrant was sought by prosecutors that would allow the agents to conduct a complete examination of Vallerius' computer. Magistrate Judge Jonathan

---

[2]     During this time, the DEA agents continued to speak with federal prosecutors in Miami, Florida over the telephone about the status of the search and the examination of the computer's contents.

[3]     Lewis eventually learned that the Bitcoin wallet contained approximately $500,000. He does not know how agents became aware of this figure.

[4]     Agent Lewis testified that his office was located within the secondary inspection area, but in a more remote location of the terminal.

Goodman granted the Government's request for a search warrant on September 1, 2017, after which a forensic examination of the computer took place. Defendant now argues that the initial questioning by Lewis, whereby he requested the computer password and cell phone personal identification codes, failed to comport with the Fifth Amendment, and that any information obtained as a result of that conversation should be suppressed. [D.E. 23]. Accordingly, Vallerius moves to suppress the contents and any information obtained from the search of his laptop computer, his cell phone and that of his wife and the contents of the tablet taken from his possession at the airport. *Id*.

## II.    ANALYSIS

Defendant's Motion raises two issues: first, whether Agent Lewis needed to provide *Miranda* warnings before asking Vallerius for the passwords and personal identification codes necessary to open his laptop computer and cell phone; and second, whether the search of the computer for evidence of Vallerius' connection to the DEA's Dream Market investigation required a warrant. We address each of these arguments in turn.

### A.    *The Fifth Amendment Did Not Require Agent Lewis to Administer Miranda Warnings*

Defendant first argues that officers needed to provide *Miranda* warnings before asking him to provide his computer password and cell phone PIN code. We disagree.

The Fifth Amendment provides that "[n]o person…shall be compelled in any criminal case to be a witness against himself." U.S. Cont. amend. V. This guarantees

that statements a defendant makes during custodial interrogations cannot be used against that defendant in court unless the government first advises the suspect of the constitutional rights set forth in *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A person is deemed to be in custody when, "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement…to such extent that he would not feel free to leave." *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987) (citations omitted). To be more specific, the Supreme Court has said that whether a suspect is in custody turns on whether restriction on the suspect's freedom of movement are "of the degree associated with formal arrest." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984) (citations omitted). The test is an objective one; the subjective beliefs of the defendant and the interviewing officer are irrelevant. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

But in the case of those seeking entry to the United States, whether such a person can be considered "in custody" for purposes of *Miranda* "should be interpreted in light of the strong government interest in controlling [our nation's] borders." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996); *see also United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982) ("Interrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*."). "Because of the overriding power and responsibility of the sovereign to police international borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry [into] the United States." *Lueck*, 678 F.2d at 899;

*cf. United States v. Vigil-Montanel*, 753 F.2d 996, 998 (11th Cir. 1985) (discussing *Lueck* in airport-security context). Due to this responsibility, "some degree of questioning and delay is necessary and to be expected at entry points into the United States." *Moya*, 74 F.3d at 1120. As such, "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam and to the degree associated with formal arrest." *Id.*

The Eleventh Circuit's decision in *Moya* is instructive. In that case, the defendant arrived at Miami International Airport bearing a resident-alien card and a Dominican passport. *Id.* at 1118. A computer check on the resident-alien card indicated that the defendant may have been previously deported. *Id.* Border patrol agents referred the defendant to a secondary inspection area at customs, where he was questioned about his immigration status. *Id.* Moya told agents that he was entering the United States to see his family and denied having been deported, but he did admit admitted that he was not a United States citizen. *Id.*

Post-conviction, Moya moved to suppress the statements he gave at the airport, arguing that officers needed to provide *Miranda* warnings. The Eleventh Circuit disagreed. Stressing that "events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country," the Court found that Moya was not in custody at the time he answered questions about his immigration status. *Id.* at 1119-1120. The Court based this decision on several factors: (1) Moya had not been moved or physically restrained by officers on the way to the scene of the interview; (2) handcuffs were not used on

8

Moya prior to the interview; (3) officers did not have their guns drawn at the time the interview took place; (4) Moya was not booked, told of formal accusations, or told he was under arrest; and (5) Moya made no admissions during the interview that would have led a reasonable person to conclude that he would be arrested immediately. *Id*. at 1119.

Applying the same factors discussed in *Moya* to the case before us, we conclude that Vallerius was not in custody at the time he provided his password and PIN codes. Vallerius had not been restrained or moved at the time he answered the question posed by Agent Lewis. *See United States v. Munoz-Gutierrez*, 259 F. App'x 197, 200 (11th Cir. 2007) (finding that referral of a person entering the United States to a secondary inspector is part of the routine border interrogation and does not, in and of itself, require a *Miranda* warning) (citing *Moya*, 74 F.3d at 1120). Agent Lewis had not placed Defendant in handcuffs, no guns were drawn at the time Vallerius provided the information, and Defendant never asked to leave the secondary inspection area. *See United States v. Medina*, 167 F. App'x 161, 166 (11th Cir. 2006) (denying motion to suppress based on *Moya* because officers did not restrain the suspect or tell him that he was under arrest, and defendant never asked to leave the interview). Under these circumstances, the officer's conduct had not rose to such a level that would cause a reasonable person to feel that his freedom was limited to the degree normally associated with formal arrest, and *Miranda* warnings were therefore not required. *Moya*, 74 F.3d at 1120.

We also find that the Motion should be denied because Agent Lewis' question could in no way be construed as sufficiently "accusatory" to transform the confrontation into a custodial interrogation. *See id.* In fact, not a single accusatory question was ever posed to Defendant. Lewis obtained the information at issue by asking Defendant a simple question, to which Vallerius responded without hesitation and of his own free will. *Cf United States v. Jayyousi*, 657 F.3d 1085, 1110-1111 (11th Cir. 2011) (border questioning became custodial when agent accused individual of training in al-Qaeda camp and participating in terrorist activities). Such a simple, straightforward question cannot and should not be deemed a custodial inquiry under the guidance provided by *Moya*.

Undeterred, Defendant contends that this case involves special circumstances, and that the particular facts known to the DEA and HSI prior to the interview require us to look beyond the fact that the questions posed to Defendant took place at the border. According to Defendant's argument at the evidentiary hearing, Agent Lewis needed to provide *Miranda* warnings because the initial decision to pull him into secondary inspection was based entirely on the investigation into Vallerius' online activities and had nothing to do with Defendant's entry into this country. Defendant claims that if some form of "preexisting suspicion" exists at the time a suspect arrives at the border, *Miranda* warnings are required before any questions are asked.

We are not persuaded by this argument. In the first place, Defendant has not provided any authority to support such a broad proposition. Additionally, the Eleventh Circuit's decision in *Jayyousi* forecloses this argument. In that case, a

10

suspect was under investigation for suspected links to terrorist groups at the time he arrived at Chicago's O'Hare International Airport. *Jayyousi*, 657 F.3d at 1094. The suspect failed to declare that he was traveling with more than $10,000 in his possession when he completed his entry forms, and was accordingly referred to secondary inspection at the airport. *Id*. An FBI agent interviewed the suspect about his failure to accurately complete the customs form, but the discussion touched upon the defendant's international travel. *Id*. The agent also told the defendant that he wanted to gain the suspect's cooperation in order to help the FBI prevent future terrorist attacks against the United States from occurring. *Id*. at 1109. As the facts of that case show, at the time the interview took place, the FBI: (1) suspected that the defendant had ties to terrorist groups in Afghanistan; and (2) sought to obtain information about those ties during the airport interview. *Id*.

The Eleventh Circuit found that the initial interview did not require *Miranda* warnings because the suspect was not in custody at the time the questioning took place. *Id.*, at 1110. More importantly, and for purposes of Defendant's argument about pretext, the Eleventh Circuit's decision makes clear that it made no difference that the suspect had been the subject of a prior FBI investigation. Instead, the Court focused exclusively on the circumstances surrounding the interrogation – not the fact that the suspect was being investigated for his links to terrorist organizations – in order to determine whether the interrogation became custodial under *Moya*. *Id*. at 1109. The Court held that it had not, due to the fact that the suspect had not been

restrained or handcuffed, and did not ask to leave the interrogation room at the time the FBI conducted its interview. *Id.*[5]

We must follow this reasoning and look to Agent Lewis's conduct at the time he requested Defendant's passwords, rather than the suspicions held by the DEA prior to the airport confrontation. As detailed above, Defendant was not in custody for *Miranda* purposes at the time Agent Lewis posed his question, as Vallerius had not been restrained or handcuffed, was not placed under arrest, and never asked to leave the secondary inspection area at any point after Agent Lewis requested the information. In accordance with *Jayyousi* and *Moya*, Agent Lewis did not need to provide *Miranda* warnings before asking for Vallerius' password and PIN codes, and the Motion to Suppress based on this argument should be denied. *See id.*

**B.** **_The Search of Defendant's Computer Did Not Violate the Fourth Amendment_**

Defendant also challenges the search of the computer that took place after he provided the password to Agent Lewis. Defendant claims that the consent to search the computer was not knowing and voluntary because that consent "was given based

---

[5]     The Eleventh Circuit did, ultimately, find that the latter portion of the interview was custodial in nature and required *Miranda* warnings. *See Jayyousi,* 657 F.3d at 1110-1111. But this does not change our ultimate finding that *Miranda* warnings were unnecessary, as the Court's decision in *Jayyousi* centered on the fact that the FBI agent conducting the interview accused the suspect of engaging in terrorist activities during the second interview and "a reasonable person would have felt subjected to a degree of restraint comparable to arrest." *Id.* at 1110. We do not have such a scenario here, as the only question asked of Defendant concerned his password and PIN codes, and no accusations were ever made.

on false information and deception." [D.E. 23, p. 12].  For purposes of the Fourth Amendment, however, Vallerius consent is irrelevant.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. Amend. IV. But searches at the border, "from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered our country from outside." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). Border searches never require probable cause or a warrant, *id.*, and reasonable suspicion is only required "for highly intrusive searches of a person's body," such as strip searches or x-ray examinations. *United States v. Alfaro-Moncada*, 607 F.3d 720, 729 (11th Cir. 2010); *see also United States v. Santiago*, 837 F.2d 1545, 1548 (11th Cir. 1988) (finding that a secondary customs search following the initial inspection is proper even absent reasonable suspicion of criminal activity).

As an initial matter, we find that Defendant's consent was knowing and voluntary, as the record makes clear that Vallerius answered the question posed by Agent Lewis of his own free will. *See United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) ("In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."). Nevertheless, we hold that Defendant's consent is unnecessary because Agent Lewis did not need to obtain *any* consent in order to conduct a search of Vallerius' belongings, including his computer.

13

*See United States v. Vergara*, 884 F.3d 1309, 1312-13 (11th Cir. 2018) (forensic examination of defendant's cell phones after disembarking from cruise ship did not require search warrant or probable cause to comply with Fourth Amendment's reasonableness requirement); *United States v. Kandhai*, 629 F. App'x 850, 851 (11th Cir. 2015) (customs agents at airport did not need a warrant to search defendant's suitcase for suspected narcotics, after it had arrived on international flight, because the search was conducted at the functional equivalent of the border). Here, agents possessed independent authority to search the electronic devices for evidence of criminal activity or contraband as a result of the border search doctrine, and therefore consent is immaterial. *See Vergara*, 884 F.3d at 1312. Accordingly, we find this argument to be without merit.[6]

Defendant's claim that the search took place in a concerted effort to confirm his connection to the Dream Market investigation is likewise ineffective. We are persuaded by the Second Circuit's decision in *United States v. Irving*, whereby a defendant moving to suppress evidence under similar circumstances advanced the same argument set forth by Defendant here. *See United States v. Irving*, 452 F.3d 110 (2d Cir. 2006). Specifically, the movant in *Irving* sought to suppress statements made to and evidence obtained by federal agents during a routine border search, arguing that the search took place as a pretext to obtain information related to a different

---

[6]     Defendant also claims that any consent given was involuntary because he was "under the influence of narcotics" at the time he provided such consent. [D.E. 23, p. 11]. Even if we determined that consent was necessary – which we do not – Defendant provided no evidence whatsoever that this was indeed the case, and we therefore reject this argument outright.

criminal investigation involving the defendant.  *Id*. at 115. The Second Circuit rejected this argument, finding that "[i]n the case of searches at airports, it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion, but require reasonable suspicion for searches of passengers that are suspected of criminal activity." *Id*. at 123 (citations omitted). "From this we reason that the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *Id*.

Based on *Irving*, and in light of the Government's interest in controlling the nation's borders, it stands to reason that a search of an individual's belongings at an airport is unaffected by the fact that the search is prompted by other law enforcement agents or an investigative motive. *See generally United States v. Schoor*, 597 F.2d 1303, 1306 (9th Cir. 1979) (Kennedy, J.) ("That the search was made at the request of the DEA officers does not detract from its legitimacy. Suspicion of customs officials is alone sufficient justification for a border search[, and] [t]he source of that suspicion is irrelevant in sustaining the search.") (citations omitted); *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) ("We also conclude that the CBP officer was entitled to rely on information provided by the DEA task force to justify the border search in this case…Whether a Customs official's reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search[.]"). It would not make sense for us to allow *any* passenger to be searched at the border without reasonable suspicion, but to make exceptions for those suspected of criminal activity prior to their arrival into the United States. As such,

the subjective intent of what officers hoped to gain by conducting the search does not make a difference. *Irving*, 452 F.3d at 123 ("As pretext should not determine the validity of a border search, it also should not determine whether a border search is routine (meaning it does not require reasonable suspicion).").

We therefore conclude that the information obtained from Defendant's computer was done so with his consent – even though such consent was unnecessary – and did not require a warrant despite the previous investigation into Defendant's online activities. Accordingly, the search warrant obtained by prosecutors following the search of the computer at the airport is in no way "tainted" by the initial search, and should be upheld as valid and enforceable under the Fourth Amendment.

## III.   CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress be **DENIED**. Pursuant to Local Magistrate Rule 4(b), the Parties shall have fourteen (14) days to file written objections, if any, with the Honorable Robert N. Scola, United States District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND ORDERED** in Chambers at Miami, Florida this 1st day of May, 2018.

/s/ Edwin G. Torres
EDWIN G. TORRES
United States Magistrate Judge