```
 1                IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                              MIAMI
                     CASE NO. 17-CR-20648-RNS-1
 3     _____

 4      UNITED STATES OF AMERICA,
                              Plaintiff
 5              vs.                            April 18, 2018

 6      GAL VALLERIUS,
                              Defendant.
 7     _____

 8       MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE

 9          BEFORE THE HONORABLE EDWIN G. TORRES,

10        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
       _____

11                        A P P E A R A N C E S

12
        FOR THE PLAINTIFF:     JUAN ANTONIO GONZALEZ, JR., AUSA
13      UNITED STATES OF       CATHERINE ALDEN PELKER, AUSA
        AMERICA                U.S. Attorney's Office HIDTA
14                             11200 NW 20th Street, Suite 101
                               Miami, FL 33171
15                             (305) 715-7640
                               Juan.antonio.gonzalez@usdoj.gov
16
        FOR THE DEFENDANT:     ANTHONY J. NATALE, AFPD
17      GAL VALLERIUS          LAUREN KRASNOFF, AFPD
                               Federal Public Defender's Office
18                             150 W Flagler Street, Suite 1500
                               Miami, FL 33131
19                             (305) 533-4246
                               Anthony_natale@fd.org
20

21
        REPORTED BY:           GIZELLA BAAN-PROULX, RPR, FCRR
22                             United States Court Reporter
                               400 North Miami Avenue, Suite 8S32
23                             Miami  FL  33128
                               (305) 523-5294
24                             gizella_baan-proulx@flsd.uscourts.gov

25      Also present:
                Hebrew Interpreters, via TIP line
```

1              <u>I N D E X</u>

2    Witness          Direct      Cross      Redirect     Recross

3    S.A. STEPHEN       22          46          59

4    LEWIS

5    LILITA INFANTE     64          82          90

6

7

8

9

10

11          <u>G O V E R N M E N T   E X H I B I T S</u>

12   Exhibit                           Received     Admitted

13   1                                                28

14   2                                                28

15   3                                                28

16   4                                                28

17   5                                                28

18   6                                                35

19

20

21          <u>D E F E N S E   E X H I B I T S</u>

22   Exhibit                           Received     Admitted

23   1                                                65

24   2                                                65

25   3                                   73          76

<u>P R O C E E D I N G S</u>

*(The following proceedings were held in open court.)*

**THE COURTROOM DEPUTY:**  The United States District
Court for the Southern District of Florida is now in session,
02:25   the Honorable Edwin G. Torres presiding.  Calling case United
States of America versus Gal Vallerius, case
17-20648-criminal-Judge Scola.  Counsel, please state your
appearances for the record.

**MR. GONZALEZ:**  Good afternoon, Your Honor.  Tony
02:25   Gonzalez and Catherine Alden Pelker on behalf of the United
States.

**MR. NATALE:**  Good afternoon, Your Honor.  Anthony
Natale from the Federal Public Defender's office.  Along with
me is assistant federal public defender, Lauren Krasnoff, and
02:26   our paralegal who has been working on the case, Michelle
Montanaro, as well as Mr. Vallerius who is present with the aid
of a Hebrew interpreter via the telephone.

**THE COURT:**  Good afternoon, everybody.  Have a seat.
Okay.  Can you hear me, Mr. Interpreter?

02:26   **THE INTERPRETER:**  The interpreter can hear you, Your
Honor.

**THE COURT:**  Okay, good.  Good afternoon, everybody.
This is an evidentiary hearing in connection with the
defendant's motion to suppress.  Before we begin --

02:26   **MR. NATALE:**  Your Honor, I don't think he's able to

1  hear.

2       THE COURT:  Well, the machine has to be pointed

3  towards the -- toward that area.  If it's not pointed there, it

4  won't work.

02:27  5       THE DEFENDANT:  I hear the interpreter loud and clear.

6  It is Your Honor that I'm unable to hear.  No, I'm sorry.  On

7  the contrary, I hear the honorable judge very well, but it is

8  the interpreter who is very, very faint, the voice of the

9  interpreter.

02:27 10       THE COURT:  Okay.

11       MR. NATALE:  Could we have a sample to see if we can

12  have the interpreter translate what I'm saying and see if you

13  can hear that.

14       THE INTERPRETER:  Try it on the Hebrew line?

02:27 15       MR. NATALE:  Yes.

16       THE DEFENDANT:  I hear you, the interpreter, very,

17  very faintly.  On the other hand, I hear very loud when you

18  spoke with the judge on the English line; I could hear -- I

19  could hear the interpreter very well.  We can just use this

02:28 20  line, just the English line.

21       THE INTERPRETER:  One second.

22       THE COURT:  We may have this problem because of the --

23       THE INTERPRETER:  The defendant says that when I speak

24  very loud, it's just as faint, and the defendant wonders

02:29 25  whether the interpreter can use the English line for the entire

1  proceeding because then he can hear me well, but I'm told here

2  that that would not work.

3         THE COURT:  Right.  Then we wouldn't be able to

4  proceed with the --

02:29  5         THE INTERPRETER:  Then it would be consecutive, I'm

6  told.  We couldn't do it simultaneously that way.  Let me

7  explain that to the defendant if I may, Your Honor.

8         THE COURT:  Give him that one.  It could be that that

9  machine is not as strong.  Replace that one with this one and

02:30  10  make sure it's pointed forward.

11         THE INTERPRETER:  We're having a serious problem here.

12  No matter what we do at our end in New York, the defendant can

13  barely hear, even though we are speaking very loud and probably

14  get sore throats after half an hour.  Also at the same time, if

02:31  15  we speak up so loud, we're blowing up our own eardrums that

16  way.

17         So I'm told by the person in charge here,

18  Mr. Anderson, that there is some problem at your end,

19  unfortunately, and we are hoping you can somehow remedy it.

02:32  20  Maybe he needs a different headset, I'm told.

21         THE COURT:  We have tried that.

22         MR. NATALE:  We have tried a different headset.  Could

23  someone try to speak again on the Hebrew line, please.

24         THE INTERPRETER:  Okay.  I'll try that right now.

02:32  25         It's very, very soft, unlike the English.

1        **THE COURT:**  That may be the best --

2        **MR. NATALE:**  Right, it can be heard.  We can hear it.

3        **THE INTERPRETER:**  The defendant is saying that if he

4    hears, as he does, the English very loud and the Hebrew very

02:32  5    soft, it will drown out the Hebrew, and I'm not going to be

6    able to hear the Hebrew at all.

7        **THE COURT:**  That makes sense.

8        **MR. NATALE:**  And what about --

9        **THE INTERPRETER:**  Actually, wait.

02:33 10        **MR. NATALE:**  Let me ask you this --

11        **THE COURT:**  Try now.

12        **THE INTERPRETER:**  Just one second.  I have a big

13    expert right next to me.  I've been doing this for 30 years,

14    but not with this machine, so the expert -- better speak with

02:33 15    the expert.

16        **MR. ANDERSON:**  Hello?  This is Peter Anderson.

17        **MR. NATALE:**  Peter, could you have the interpreter

18    speak in Hebrew again?

19        **THE INTERPRETER:**  I don't know if the defendant is

02:33 20    trying to listen to both the English and Hebrew, but that might

21    be part of the problem.  Does he have a headset on?

22        **THE COURT:**  Yes, he has a headset on.

23        **MR. ANDERSON:**  Well, the English line is coming

24    through very clearly, but apparently the defendant says he can

02:33 25    barely hear the interpreter when he's speaking --

1            THE COURT:  In part because the sound in the courtroom

2    is overwhelming, I think, is -- what he's saying it's

3    overwhelming his -- so I'm trying to turn that down.

4            MR. ANDERSON:  Well, let's see.  I will have the

02:34  5    interpreter speak in Hebrew again to the defendant to see if he

6    can hear better.

7            THE COURTROOM DEPUTY:  Because I can hear.  I'm

8    listening, and I can hear him.

9            THE COURT:  That may be the best we're going to be

02:34  10   able to do.  So the one thing we may have to do is proceed with

11   it, and I'm trying to turn down the volume here, but I can't.

12           MS. KRASNOFF:  I think what we may be cautious about

13   is just pausing to give the interpreter a chance because when

14   we speak, it overrides what the interpreter is saying.  So if

02:35  15   we take breaks, give the interpreter a chance, I think that may

16   work.

17           THE COURT:  Makes sense.  I'm trying to turn down the

18   volume in the courtroom, but I can't seem to do it.  How about

19   now?

02:35  20           THE INTERPRETER:  The interpreter will try.

21           THE DEFENDANT:  I hear maybe a drop louder, that's

22   all.

23           THE COURT:  That may be the best we're going to be

24   able to do.

02:35  25           MR. NATALE:  We may be able to -- you don't need the

1  earphones to hear the English, right?  So if you sort of open

2  it up like that, and then put it on for the Hebrew, that may

3  work, so they won't be over one another.  Let's try that.

4          THE INTERPRETER:  This is the other Hebrew

02:37  5  interpreter.  What happens is that we hear ourselves very well

6  on the phone.  I hear myself and the defendant hears themselves

7  when we talk, but we can't hear -- I hear him well.  He says he

8  cannot hear me very well, but somewhat.  So maybe we can try

9  and proceed and see what happens.

02:37  10         THE COURT:  Right.  Effectively though we may be in a

11  position where the defendant -- unfortunately we wanted to have

12  a Hebrew interpreter here, but for some reason our office was

13  incapable of accommodating that.

14         THE INTERPRETER:  Well, it would take time.  The

02:37  15  interpreter can come, but it's costly, and we wanted to save

16  some money for the taxpayers.

17         THE COURT:  Oh, no.  I mean, our local people.  We

18  have local people.

19         THE INTERPRETER:  No.  I know local people, it's very

02:38  20  hard to get Hebrew interpreter right now.  So let's give it a

21  try and if necessary is there an option of doing it

22  consecutively?

23         THE COURT:  So anyway, I guess there are a lot of

24  hearings going on today where Hebrew interpreters were needed.

02:38  25  So effectively, though, if the defendant can't hear properly,

then it's tantamount to not hearing, but the defendant's

presence at the hearing is not required, so I think we'll just

have to go forward with that.

His testimony, though, if you intended to call him, we

can't do it unless he can fully understand.  So that part of

the hearing, notwithstanding the fact that his presence is not

constitutionally required, that part of the hearing we may have

to postpone.  Do you intend to call the defendant anyway?

MR. NATALE:  No, Your Honor.  The only thing is that

for him to be able to help us to understand what's going on, we

will need him to at least hear well enough.

MS. KRASNOFF:  It is what Your Honor said.  These mics

are just much louder in the headphones than the interpreter is,

so when we are speaking and they are interpreting, you can't

hear the interpreter.

THE COURT:  I understand.  And they were supposed to

do the -- we have a new sound system.  But this part of the

sound system I don't think they got it right.

MR. NATALE:  Simultaneously.  In succession.

THE COURT:  We'll try to do that.  Okay?  I don't

understand why I can't lower the volume of the speaker because

he's hearing the overhead.  So if I could turn that down --

THE INTERPRETER:  Your Honor, the interpreter would

like to ask the defendant how it is now.  Let me ask him one

more time.

1          Your Honor, the defendant says that he can hear the

2    interpreter's voice over in the room rather than on the

3    headphones.  The interpreter would like to -- she hears herself

4    louder than this other speaker.  We're drowning ourselves out.

02:41    5    Can we do it consecutively, if everybody speaks slowly, and we

6    can do it sentence by sentence?

7          **THE COURT:**  It's going to be too hard to do that, I

8    think.

9          **MR. ANDERSON:**  Yes, this is Peter Anderson again.  How

02:41   10    are you?

11          **THE COURT:**  I'm prepared to go forward in starting.

12    So if the defendant can't understand, then we'll just have to

13    make a finding that effectively he was not present.

14          **MR. ANDERSON:**  Right, but the other consideration -- I

02:41   15    don't know whether this is even possible -- but there might be

16    other courtrooms in your building that are equipped with the

17    TIP system that might work.  Is that a consideration?  Is that

18    something that's available or no?

19          **THE COURT:**  The only one I can think of is probably

02:41   20    not, so we'll just have to go forward.  Okay?

21          **MR. ANDERSON:**  All right.

22          **THE COURT:**  With that --

23          **THE INTERPRETER:**  Let the interpreter just convey to

24    the defendant.  Okay?

02:42   25          **THE COURT:**  Okay.

```
          1           THE DEFENDANT:  I understand.

          2           THE COURT:  All right.  Let me start with, first of

          3   all, counsel for the defendant.  Is there a fact issue here?

          4   Is it primarily a legal issue that we're dealing with?

02:42     5           THE INTERPRETER:  Your Honor, the interpreter would

          6   ask that everybody speak slowly because we have difficulties

          7   anyway.  So let's everybody speak slowly.  Thank you.

          8           THE COURT:  Okay.  What's the response that,

          9   Mr. Natale?

02:42    10           MR. NATALE:  Yes, Your Honor.  We believe that we do

         11   need a factual record because there is -- our argument is

         12   really based on the sequence of events.  And we start off from

         13   how they acquired knowledge that he was coming, whether or not

         14   that was in any way an infringement of any rights.

02:43    15           And then it goes through step by step as far as what

         16   happened at what time.  And I think that unless we have a

         17   record of the factual sequence, I think that it's going to be

         18   hard for the Court to make an appropriate ruling regarding the

         19   law at each particular stage.

02:43    20           THE COURT:  In other words, you're saying that he was

         21   under suspicion before he got to the airport?  Is that the

         22   point you're making?

         23           MR. NATALE:  That's correct, Your Honor.  And --

         24   that's correct.

02:43    25           THE COURT:  And are you conceding that there was
```

1   reasonable suspicion, but you're challenging the basis of that?

2   Or you're not conceding that there was reasonable suspicion?

3          **MR. NATALE:**  No, Your Honor.  The first thing is we

4   don't have any information directly on it now, but in

02:44   5   August 25th of last year, the government received information

6   that Mr. Vallerius was going to be coming to the United States.

7          Prior to that, there is information that the

8   government had through their investigation online, in doing

9   investigation online.  They had that information prior to the

02:44  10   25th.

11          On the 29th, they contacted the -- I believe it was

12   HSI, Homeland Security and/or the Customs and Border Protection

13   people, telling him that they expected Mr. Vallerius and his

14   wife to come to the United States on August 31st.

02:45  15          On August 31st, they land, and then there is a

16   sequence of events which I think are significant.  I also think

17   that for the Court to understand what happened before the 25th

18   is also significant in order to put into context the arguments

19   that we're making as far as whether this was a solely border

02:45  20   search, and if so, what was the scope of that, or was this

21   something other than in reality a border search, and were there

22   implications of the Fifth Amendment and quite possibly, how

23   they got the information that he was coming was something which

24   hasn't been provided in discovery, but yet we nonetheless

02:46  25   mentioned it in our motion that that could be a basis if it was

```
 1   gotten in some sort of illegal or improper way.

 2        So I really think that we can go through the facts and

 3   circumstances of the case.  It's also going to be important,

 4   Your Honor, because -- to explain to the Court the steps that

 5   were taken with the computer and with the phone at which points

 6   so Your Honor can make a determination as to what information

 7   was gleaned at what point and whether there should have been

 8   constitutional protections at those points.

 9        THE COURT:  And given the -- I understand the Fifth

10   Amendment argument -- you're arguing that the initial

11   questioning, you contend, was custodial and required Miranda,

12   correct?

13        MR. NATALE:  That's correct.

14        THE COURT:  And then only after that process did, for

15   example, the password to the computer get conveyed; is that

16   correct?

17        MR. NATALE:  That's part of it.  The other thing that

18   we're saying is that the password was received in the manner

19   which was not consensual.  So we're challenging the consent of

20   that.  And so that is going to be a factual issue, that is,

21   whether the consent was given, and what was the scope of that

22   consent, and whether the scope of that consent exceeded, or

23   whether the actions of the law enforcement exceeded the scope

24   of the consent that was given.

25        THE COURT:  And why on that question does it matter?
```

```
 1  Because why doesn't the Vergara case resolve this, I guess?

 2          MR. NATALE:  Your Honor, I think Ms. Krasnoff is going

 3  to argue that, in particular, but we have a number of reasons

 4  why we think that that case does not answer that question.

 5          MS. KRASNOFF:  Good afternoon.

 6          THE INTERPRETER:  The interpreter would like to

 7  clarify what question gets no answer?  The interpreter did not

 8  get it.  Can you please repeat it?  It's important.

 9          THE COURT:  Yes.  Ms. Krasnoff?

10          MS. KRASNOFF:  The question was whether the Vergara

11  case takes care of whether consent matters.

12          THE COURT:  And what's the answer?

13          MS. KRASNOFF:  This case is different than Vergara

14  because there was a password on the computer.  So in Vergara I

15  absolutely agree that the way the law stands now, that the

16  agents could open up the computer, look at what's on the

17  computer, and go into it because it's a border search and you

18  don't need very much for a border search.  The difference in

19  this case is when the agents open up the computer, they can't

20  do anything more because there's a password.  And so they need

21  one of two things at that point:  Either, consent via the

22  password given by Mr. Vallerius, or a search warrant because

23  other than getting a search warrant, there would be no way to

24  force him to give that password to get into the computer.

25          THE COURT:  But in Vergara didn't they ask the
```

1  defendant to turn on the phone, and then once he turned on the

2  phone, then they started looking through it?  How is that

3  different?

4          MS. KRASNOFF:  Because if the defendant in that case

02:49  5  had turned on the phone and it had a code lock, that would be

6  this case.  The difference is that there was a password that

7  was required to either be given by the defendant or ordered to

8  be given by a court.

9          In Vergara they didn't need to do that because it was

02:49  10  not password protected.

11          THE COURT:  I see.  And you think that makes a

12  difference because of that?

13          MS. KRASNOFF:  Well, I think that if at that point the

14  agents had decided we're going to go get a warrant, we might

02:50  15  not be here.  Our argument would still be we didn't think there

16  was probable cause, and our reason is because we don't think

17  there is a nexus between these devices and the information that

18  they had.  But that's --

19          THE INTERPRETER:  Can you please slow down, ma'am.

02:50  20          MS. KRASNOFF:  Yes, of course.  But those are not the

21  facts of this case.  They didn't go get a warrant at that

22  point.  They instead turned to Mr. Vallerius and said, may we

23  have your password?  And our position is at that point they

24  were asking for his consent.  And so the question is was the

02:50  25  consent validly given?

1       If we were in a different world where they went and

2   got a warrant, this would be a very, very different argument

3   about, I think, just whether there was probable cause in the

4   warrant or in the affidavit for the warrant.  But we're not in

02:50  5   that world because instead of getting the warrant at that

6   point, they asked for what was essentially consent by asking

7   for his password.  And so then we have to question, well, was

8   that consent valid?

9       THE COURT:  Okay.  And who would have the -- actually,

02:51 10  given the nature of the case and the motion that's filed, who

11  has the initial burden here in this case?

12      MS. KRASNOFF:  Our position is the government -- well,

13  we have the burden of production in the sense that we filed the

14  motion, but assuming that we have laid valid claims, I believe

02:51 15  that the government has the burden to establish that the

16  consent was knowing and voluntary.

17      THE COURT:  I don't think the government's initial --

18  I don't think the government's first argument is the consent.

19      MS. KRASNOFF:  I think their argument is consent

02:51 20  doesn't matter because they could have gone and gotten this

21  warrant anyway.  Our position is they didn't.  Those aren't the

22  facts here.  And so you can't skip over the way that they did

23  proceed which was to ask for consent via asking for the

24  password.

02:52 25      THE COURT:  Well, that raises an interesting question,

1   but I'll table that.  Why don't I turn to the government.

2        Mr. Gonzalez, who did you intend to call first?

3        **MR. GONZALEZ:**  Well, Judge, if I could first address a

4   couple of points that the defense made, and then I'll answer --

02:52   5        **THE INTERPRETER:**  Mr. Gonzalez, is this you?  Can you

6   please slow down and speak into the mic.

7        **MR. GONZALEZ:**  Yes.  Tony Gonzalez on behalf of the

8   United States.  What happened here in this case, if we take out

9   the laptop and replace it with a bag.  A traveler comes into --

02:52   10       **THE INTERPRETER:**  And replace it with what?  I'm

11  sorry.

12       **MR. GONZALEZ:**  A bag, a piece of luggage.  The

13  traveler comes into the United States and is taken to secondary

14  inspection.  He is told we need to look in your bag.  You have

02:53   15  a lock on it.  Unlock it, or if not, we will have to break it.

16  And you go inside your bag.

17       Because the defense is presupposing that the United

18  States, HSI, would not be able to get into the laptop but for

19  the defendant's code.  The defendant, just like the bag, where

02:53   20  he decides, fine, I will unlock it, went ahead and gave the

21  password to his laptop.

22       The government is looking at that laptop and the

23  government's right to look at that laptop is not because the

24  defendant gave consent.  It is because of the border search

02:53   25  authority to look into that laptop.

1      Moreover, I believe it's undisputed the defendant was

2  told, we need to look in your laptop in order to look for

3  contraband and evidence of crime.  And knowing that, he went

4  ahead and gave his password so that his laptop would not be

02:54  5  detained.  So it is --

6          THE INTERPRETER:  So the laptop?

7          MR. GONZALEZ:  Would not be detained.

8          THE COURT:  And then -- what you're saying is that the

9  government could have forcibly opened the laptop.

02:54  10         MR. GONZALEZ:  Absolutely.  Could have taken the

11  laptop, could have gone ahead and done a forensic examination,

12  and would have kept that laptop until such time as it could be

13  forcibly opened.

14         THE COURT:  And -- correct me if I'm wrong -- wouldn't

02:54  15  the government's remedy in that situation if the defendant did

16  not voluntarily consent is to turn the defendant around and

17  expel him?

18         MR. GONZALEZ:  No.  No.  The defendant can be turned

19  around.  The defendant can be passed on and let him to continue

02:54  20  his travels.  But the laptop stayed in the custody of HSI,

21  which is somewhat a common occurrence when individuals do not

22  give their password.

23         THE COURT:  In other words, you would say, well, you

24  can let him through, but you would seize the laptop.

02:55  25         MR. GONZALEZ:  You, sir, are entering this country

1  because of the visa waiver program between the United States

2  and France, which is where you are coming from.  We are going

3  to let you in because, you, the person are lawfully in this

4  country.  We are not going to let your laptop in because we're

02:55  5  not sure yet whether or not your laptop can lawfully enter this

6  country.

7          **THE COURT:**  And then what would happen to the laptop

8  in that situation?

9          **MR. GONZALEZ:**  What would happen to the laptop in that

02:55 10  situation is it would be seized by HSI.  The most likely

11  scenario is that it would then go in for further forensic

12  examinations to try to break into that laptop, and it would

13  ultimately either be searched, or it would sit on the shelf

14  until such time as a tool was available that would allow law

02:55 15  enforcement to -- as part of --

16          **THE INTERPRETER:**  Until what time it would sit?

17          **MR. GONZALEZ:**  It would sit on the shelf until such

18  time as a tool was developed that would allow law enforcement

19  to get into that laptop.  Whether or not a warrant would be

02:56 20  needed that the point, I don't know.  It depends on a number of

21  factors.  But in this particular case, under these particular

22  circumstances, a warrant was not needed.  But in an abundance

23  of caution, a warrant was obtained.  And it is because of these

24  circumstances that we are of the belief that the burden is

02:56 25  actually on the defense to go ahead and show this.

1          I do want to address one other thing that Mr. Natale

2    said to make sure I didn't misunderstand it because he talked

3    about, well, there was this prior investigation which

4    Mr. Vallerius was suspected.  And we concede to that.  But I

02:56  5    believe he said -- and we're not sure what that was, and we

6    need to explore it, and we'll know.

7          The issue starts when he gets off the plane.  This is

8    not a discovery deposition of the government's agents to talk

9    about ongoing investigations.  The key point what is at issue

02:57 10    here is what happens when he gets off that airplane and not the

11    government's investigation prior to all that.

12          THE COURT:  On that point, is the government going to

13    rely at any point on a reasonable suspicion threshold?

14          MR. GONZALEZ:  It is our position that that's not

02:57 15    necessary.  That is a fallback argument, and if the Court seems

16    to think for whatever reason that the simple border search

17    authority is insufficient, and it requires more --

18          THE INTERPRETER:  Can you please slow down.

19          THE COURT:  Slow down.

02:57 20          MR. GONZALEZ:  Sorry.  I apologize.  That is not our

21    initial position.  Our initial position is that the border

22    search authority allows getting into that laptop.  To the

23    extent that the Court disagrees and believes there is a higher

24    standard, then we are prepared to go ahead and go forward with

02:58 25    it.

1        But the ultimate highest standard is one of probable

2   cause of which there was an independent determination made by

3   the Court, and that affidavit lays down or lays out the

4   relevant parts of the investigation vis-a-vis.

02:58  5        **THE COURT:**  All right.  So let's do this.  Let me go

6   ahead and call -- have the government call the witness that you

7   intend to rely upon on what the issues that you believe are

8   present.  And then we'll cross on that, and then I'll give the

9   defendant an opportunity to raise whether or not any additional

02:58 10   witnesses they want to make a record of that.

11        So I'm going to table the question of the burden

12   because I do think there is actually a question here.  But just

13   to move forward, to make it easier, let me just have you call

14   the witness you want to call on the scope of the hearing as you

02:59 15   wish to have it, and then we'll start there.

16        **MR. GONZALEZ:**  Very well, Your Honor.

17        The United States would call Special Agent Stephen

18   Lewis.

19   Thereupon,

20                  **S.A. STEPHEN LEWIS,**

21   having been duly sworn by the courtroom deputy, testified as

22   follows:

23        **THE WITNESS:**  Yes, ma'am.

24        **THE COURTROOM DEPUTY:**  Sir, have a seat and state and

02:59 25   spell your name for the record.

1        **MR. NATALE:**  Can we have the rule invoked?

2        **THE COURT:**  The rule has been invoked.  Anyone step

3   out in the hall.

4        **THE WITNESS:**  My first name is S-T-E-P-H-E-N.

03:00   5   L-E-W-I-S.

6        **THE COURTROOM DEPUTY:**  Your agency, sir?

7        **THE WITNESS:**  Homeland Security Investigations.  That

8   is a component of ICE within the department of Homeland

9   Security.

03:00   10

11                    *__DIRECT EXAMINATION__*

12  **BY MR. GONZALEZ:**

13  Q.   Sir, for how long have you worked for ICE?

14       **THE COURT:**  Hold on one second.  Can you hear me,

03:00   15  interpreter?  The interpreter is not here anymore?  Go ahead.

16  **BY MR. GONZALEZ:**

17  Q.   Agent Lewis, how long have you been employed by HSI?

18  A.   **Since its inception, which is 15 years.  And part of that**

19  **was one year with U.S. Customs Service for a combined total of**

03:00   20  **16 years.**

21  Q.   And prior to that, did you have any other law enforcement

22  experience?

23  A.   **Yes, sir.  For four years I was a special agent with**

24  **Georgia Bureau of Investigation.**

03:01   25  Q.   And where --

```
 1              THE INTERPRETER:  The interpreter missed that.
 2   4 years where?  I'm sorry.
 3   A.   With the Georgia Bureau of Investigation.
 4              THE COURT:  You may have to just talk a little
 5   abnormally slower.
 6   A.   Yes, sir.
 7              THE COURT:  Try it.
 8   BY MR. GONZALEZ:
 9   Q.   You did have your first cup of Cuban coffee right before
10   coming in here, right?
11   A.   Yes, sir.
12   Q.   Try to speak slow.
13              THE COURT:  That was a mistake.
14   A.   The Georgia Bureau of Investigation.
15   BY MR. GONZALEZ:
16   Q.   Drawing your attention to the week of August 29th of 2017,
17   physically where were you assigned during that time?
18   A.   I was assigned to Atlanta Hartsfield Jackson International
19   Airport.
20   Q.   And is that an assignment you had had for a fairly-lengthy
21   period of time?
22   A.   Yes, sir.  I believe at that time I had been working at the
23   airport for about two and a half years.
24   Q.   And on that particular week, were you what is commonly
25   known as the duty agent for the airport?
```

A.   **Yes, sir.**

Q.   And as part of your duties as the duty agent, would you help other law enforcement officers at other agencies with things going on at the airport?

03:02   A.   **Yes, sir.**

Q.   And did there come a time on or about August 29th that you received a call concerning an individual whom you ultimately learned to be Gal Vallerius?

A.   **That is correct, sir.**

03:02   Q.   How did the information come to you and what was that information?

A.   **As I recall, the Miami office for DEA had reached out and made some initial coordination with our DEA liaison.  I was made aware of this coordination and asked to reach out to DEA**

03:03   **Miami and offer my assistance.**

Q.   And did you do that?

A.   **Yes, sir.**

Q.   Do you recall whom you spoke with at DEA Miami?

A.   **I believe my initial contact was with Special Agent Bradley**

03:03   **Langston (ph.).**

Q.   And did there come a time when you ultimately spoke to DEA Special Agent Lilita Infante?

A.   **Ultimately yes, sir, but my coordination really was with**

**Agent Langston until they arrived in Atlanta.**

03:03   Q.   When you say until they arrived in Atlanta, until who

1  arrived in Atlanta?

2  A.  **I beg your pardon.  Until the DEA agents from Miami arrived**

3  **in Atlanta on the 31st of August.**

4  Q.  And tell us what happened when -- well, there came a point

03:03  5  in time when the defendant, Gal Vallerius, arrived in Atlanta,

6  correct?

7  A.  **Yes, sir.**

8  Q.  The DEA agents arrived before Mr. Vallerius?

9  A.  **Correct, sir.**

03:04  10  Q.  What happened when the DEA agents arrived?  What were you

11  asked to do?

12  A.  **We had prior coordination that Homeland Security**

13  **Investigations would assist with a -- what is known as a**

14  **secondary inspection of Mr. Vallerius and his wife,**

03:04  15  **Mrs. Vallerius, to include their baggage.  When they arrived,**

16  **we worked through the logistics of what that would look like**

17  **and the procedure.**

18  Q.  Now, did there come a moment in time when they told you

19  generally what they were investigating?

03:04  20  A.  **That's correct, sir.  From my initial conversation with**

21  **Agent Langston, he laid out a basic summary and concept of the**

22  **investigation.**

23  Q.  And did that investigation involve the sale of narcotics on

24  the dark web using cryptocurrency?

03:04  25  A.  **Yes.  Yes, sir.**

1  Q.   Do you have any experience in that?

2  A.   **None to mention, sir.**

3  Q.   Now, did there come a time when you confirmed that

4  Mr. Vallerius was, in fact, a manifested passenger on a flight

03:05  5  that was coming into Atlanta?

6  A.   **Yes, sir.**

7  Q.   And where was that flight coming from; do you recall?

8  A.   **It originated from Paris, France, from Charles De Gaulle**

9  **Airport.**

03:05  10  Q.   And when that flight arrived, what did you do?  What were

11  you observing?  What happened?

12  A.   **Mr. Vallerius was on Delta flight number 83 from Paris.  As**

13  **I recall, it came in about 13:25 hours.  We had already**

14  **instructed the primary officer to select Mr. Vallerius for**

03:05  15  **secondary baggage inspection.**

16  Q.   Let me interrupt you for a second.

17  A.   **Yes, sir.**

18  Q.   When you say the primary inspector, is that the first CBP

19  officer that one would encounter when entering the United

03:05  20  States?

21  A.   **Correct, sir.  Some will refer to it as passport control.**

22  **That is the first opportunity a passenger presents himself for**

23  **admission into the United States.**

24  Q.   And did you already have a description of Mr. Vallerius?

03:06  25  A.   **Yes, sir.  I had a description, and I had seen a picture of**

1  his passport photo.

2  Q.  And was that initial officer told to go ahead and send

3  Mr. Vallerius to secondary inspection?

4  A.  Yes, sir.

03:06  5  Q.  Now, can you guide us through what happened when

6  Mr. Vallerius got off the plane?

7  A.  So again, to recap, Mr. Vallerius presented himself and

8  Mrs. Vallerius presented herself for admission to the United

9  States to the primary CBP officer.  CBP referred them to

03:06 10  baggage secondary.  Mr. Vallerius was escorted to the baggage

11  claim area where he would have retrieved his baggage.

12  Q.  When you say baggage secondary, can you describe for us

13  what that mean by that?

14  A.  The baggage claim area is where the luggage comes up, that

03:07 15  is, as the airline is returning it to passengers.  The baggage

16  secondary area is an area that is -- it's a work area, allowing

17  CBP officers to have a more-detailed and thorough opportunity

18  to question passengers as well as to inspect their belongings

19  to include their luggage.

03:07 20  Q.  So to make sure that I'm understanding you clearly, when

21  the individual first goes -- the individual flying into the

22  country meets the first CBP officer, they do not have their

23  bags, correct?

24  A.  That is correct, sir.

03:07 25  Q.  When they are then sent to secondary, they are escorted to

1  get their bags and then taken to where the secondary takes

2  place, correct?

3  A.  **That is correct, sir, at the Atlanta airport.  It may be**

4  **different in other airports.**

03:08  5  Q.  During the course of the preparation of this hearing, did

6  you send me a series of photographs?

7  A.  **Yes, sir.**

8  Q.  And what were those photographs of?

9  A.  **Those photographs were taken by CBP officer of the -- what**

03:08  10  **we refer to as the baggage inspection area, the secondary**

11  **baggage inspection area.**

12  Q.  And is that where Mr. Vallerius was inspected in secondary?

13  A.  **Yes, sir.**

14  Q.  I want to show you those photographs and ask you a couple

03:08  15  of questions about it.

16       **MS. KRASNOFF:**  We have no objection to the

17  introduction of the photographs, if that speeds things up.

18       **MR. GONZALEZ:**  We would offer 1 through 5.

19       **THE COURT:**  No objection?

03:09  20       **MS. KRASNOFF:**  No objection.

21       **THE COURT:**  1 through 5 will be admitted.

22       (Thereupon, the exhibit was admitted into evidence.)

23  **BY MR. GONZALEZ:**

24  Q.  Showing you government's Exhibit Number 1, is this where

03:09  25  Mr. Vallerius ultimately -- is this where Mr. Vallerius had his

1  secondary inspection?

2  A.  **Yes, sir.**

3  Q.  Showing you now government's Exhibit Number 2, is that a

4  different part of the same room?

03:09  5  A.  **It is the same room.  It's taken from a different angle.**

6  **The chairs along the back wall are the waiting area for**

7  **passengers waiting to be inspected.**

8  Q.  Showing you government's Exhibit Number 3, when you say the

9  chairs, are you referring to these metal chairs here?

03:10  10  A.  **Yes, sir.  That is again the same room taken from a**

11  **different angle.**

12  Q.  And showing you government's Exhibit Number 4, again, same

13  room, different angle?

14  A.  **Yes, sir.  This picture is taken from the vantage point**

03:10  15  **after -- right after a passenger would come into the baggage**

16  **area.**

17  Q.  And lastly, showing you government's Exhibit Number 5,

18  again, a different angle of the same room?

19  A.  **Different angle of the same room.**

03:10  20  Q.  At the time that Mr. Vallerius was brought into this room,

21  were there other passengers there as well?

22  A.  **Yes, sir.**

23  Q.  When an individual is sent to secondary inspection, are

24  their passports put in a folder?

03:11  25  A.  **Yes, sir.**

1  Q.   And do those folders have different colors?

2  A.   **Yes, sir, they do.**

3  Q.   And does that correspond to different places where they

4  need to go in secondary?

03:11  5  A.   **Yes, sir.**

6  Q.   And showing you government's Exhibit Number 2, do you see

7  up here where it says blue folder?

8  A.   **Yes, sir.**

9  Q.   Do you recall whether or not Mr. Vallerius was given a blue

03:11  10  folder?

11  A.   **I don't specifically recall, but it would be standard**

12  **procedure for his and Mrs. Vallerius' passport to be put into a**

13  **clear folder that has a blue border around it.  There's no**

14  **reason why there would have been a deviation from that, sir.**

03:11  15  Q.   Now, when individuals are brought in that room, are they

16  immediately taken care of, or do they have to sit in the chairs

17  and wait until they're called?

18  A.   **Generally the passengers are asked to have a seat along the**

19  **back wall where the metal chairs are at, that seating area.**

03:12  20  **Sometimes passengers may be called immediately up to the**

21  **inspection belt.**

22          **On this particular day, as I recall, Mr. Vallerius and**

23  **his wife had a seat.  While we -- you see the -- those are work**

24  **stations, those -- what appears to be wooden tables or a**

03:12  25  **counter?  So we would have taken an opportunity to review our**

1  **records in the databases before bringing him up.**

2  Q.   And when an individual is brought up for secondary, are

3  they told to bring their bags with them?

4  A.   **Yes, sir.**

03:12  5  Q.   And showing you government's Exhibit Number 1, does this

6  depict where an individual would actually have his secondary

7  inspection and where his bags would be placed?

8  A.   **Yes, sir.  In fact, the belts that are in this**

9  **photograph --**

03:13  10          THE INTERPRETER:  Wait a minute.  The belt?

11          MR. GONZALEZ:  B-E-L-T.

12  BY MR. GONZALEZ:

13  Q.   When you say belt, are you referring to this here, they

14  conveyor belt?

03:13  15  A.   **Yes, sir.**

16          THE COURT:  Turn off your other line, Mr. Interpreter.

17          THE INTERPRETER:  Oh, other line.  Sorry.

18  BY MR. GONZALEZ:

19  Q.   Going now to Mr. Vallerius in particular, did you see

03:13  20  personally when Mr. Vallerius was first coming off the plane?

21  A.   **No, sir, not when he first came off the plane.  Myself and**

22  **the two DEA agents were waiting in another room consistent with**

23  **what like a large hall that leads into the primary area.  We**

24  **had positioned ourselves to conduct a casual surveillance to**

03:14  25  **make sure that we knew that he was coming down the stairs and**

```
          1   that -- it's not uncommon for passengers to stop off to use the
          2   restroom because there are some public restrooms right there in
          3   that area.  We wanted to know when he was getting into the
          4   primary lane to go ahead to begin to move ourselves to
03:14     5   different areas.
          6   Q.   And did you see him get in that primary lane with his wife?
          7   A.   Yes, sir.
          8           THE INTERPRETER:  The interpreter missed that
          9   question.  I'm sorry.
03:14    10   BY MR. GONZALEZ:
         11   Q.   Did you see when he got into the primary lane with his
         12   wife?
         13   A.   Yes, sir.
         14   Q.   And once he did that, what did you and the DEA agents do?
03:14    15   A.   We repositioned ourselves to another portion of the airport
         16   which is where the pictures of the baggage secondary area, I
         17   placed the DEA agents into another room that is actually out of
         18   sight of that particular room.  So as a point of reference, in
         19   the photograph you see where the inspection table --
03:15    20   Q.   Let me interrupt you one second.  When you say photograph,
         21   government 1.  Go ahead.
         22   A.   So working from this photograph, there's a -- what appears
         23   to be a white table, it's actually a receptacle bin for
         24   biohazard material.
03:15    25   Q.   You've got to help me out on that.  Tell me where.
```

1  A.  **Move your finger to the right, sir.**

2  Q.  There?

3  A.  **Yes, sir.  Just beyond that is a door that leads into a**

4  **hallway.  That's another administrative and controlled area**

03:15  5  **back there.  There is a room down that hallway which is known**

6  **as the seizure room.  And that is where I placed the DEA agents**

7  **in anticipation of searching the electronic devices.**

8  Q.  Now, at this point in this room, is Mr. Vallerius there

9  with every other passenger that has been sent to secondary?

03:16  10  A.  **Yes, sir.**

11  Q.  And what happens next?

12  A.  **Mr. Vallerius and his wife were called to the belt, and the**

13  **CBP officer goes through a process which legally binds the**

14  **passenger to their customs declaration.**

03:16  15  Q.  And is that based on a series of questions that is asked?

16  A.  **Yes, sir.**

17  Q.  Are these your bags, those types of questions?

18  A.  **That will be one of the questions.  Are these your bags?**

19  **Did you pack them yourself?  Is there anything that you want to**

03:16  20  **declare that you have failed to declare?**

21  Q.  Now, so we're clear, sir, that is the normal conversation,

22  the standard protocol when someone goes to secondary, correct?

23  A.  **That is correct, sir.**

24  Q.  Now, you physically were not there to hear that, correct?

03:16  25  A.  **Yes, sir, I was.  I was with Officer Griffith (ph.).**

```
 1  Q.   Oh, okay.  I'm sorry.  I thought you were still in the room
 2  with the DEA agents.
 3  A.   No, sir.  After I got the DEA agents settled, I came back
 4  out to participate in the inspection.
 5  Q.   Very well.  And did Mr. Vallerius and his wife say, yes,
 6  these are our bags?
 7  A.   They claimed responsibility for the bags, and they claimed
 8  responsibility for packing their bags and their belongings.
 9  Q.   And what happened next?
10  A.   The inspection begins as a matter of asking them to open
11  their bags.  We begin to go through their belongings in kind of
12  a systematic manner, if you will.  Very early on I asked them
13  were they traveling with any electronic devices such as a
14  laptop or cell phones.  Mr. Vallerius did acknowledge that they
15  did have a laptop and cell phones, as well as an electronic
16  tablet.  I believe it was an iPad.
17          Then I took those -- correction.  Then I gathered up
18  all those electronic devices, and I asked Mr. Vallerius were
19  they password protected, and he said yes.  And then I explained
20  to him that I would need the password.
21  Q.   Let me interrupt you one second.  Is there a form that
22  Customs and Border Protection has entitled Inspection of
23  Electronic Devices?
24  A.   Yes, sir.
25          THE INTERPRETER:  The interpreter missed the last
```

03:17  5
03:17  10
03:17  15
03:18  20
03:18  25

```
     1  question.
     2  BY MR. GONZALEZ:
     3  Q.   Is there a form that is given out to passengers entitled
     4  Inspection of Electronic Devices?
03:18 5  A.   Yes, sir.  It's a one-page informational pamphlet that's
     6  designed to answer frequent questions by international
     7  travelers regarding the search of electronic devices.
     8           MR. GONZALEZ:  Your Honor, at this point, without
     9  objection, I think, we move in Exhibit 6.
03:18 10          MS. KRASNOFF:  Without objection.
     11          THE COURT:  I believe you're moving in government's
     12 Exhibit 6?
     13          MR. GONZALEZ:  Yes, Your Honor.
     14          THE COURT:  No objection.  It will be admitted.
03:19 15      (Thereupon, the exhibit was admitted into evidence.)
     16 BY MR. GONZALEZ:
     17 Q.   Showing you the photograph in government's Exhibit
     18 Number 5, specifically this set of shelves that are here, are
     19 those where the various forms are kept?
03:19 20 A.   Yes, sir.  There are any number of administrative forms to
     21 aid us with the inspection of luggage.
     22 Q.   I want to show you government's Exhibit Number 6.
     23 Obviously these forms all come in a pad to be handed out,
     24 correct?
03:20 25 A.   Yes, sir.
```

1  Q.   And it has a section called Why You May Be Chosen for

2  Inspection, correct?

3  A.   **Yes, sir.**

4  Q.   As well as Authority to Search?

03:20  5  A.   **Yes, sir.**

6  Q.   What Happens Now and so on?

7  A.   **Yes, sir.**

8  Q.   And it continues on the back as well?

9  A.   **That's correct, sir.  Like I said, it's a one-page**

03:20  10  **pamphlet, informational pamphlet to assist international**

11  **travelers with understanding the search of electronic devices.**

12  Q.   Now, is it the normal protocol when there's a computer

13  device, particularly if it's locked, to go ahead and give that

14  pamphlet so the passenger knows what's going on?

03:20  15  A.   **Not always, sir.**

16         THE INTERPRETER:  Excuse me, sir.  The interpreter

17  would ask Mr. Gonzalez, I think, to come a little closer

18  because he keeps in and going out.  Sorry.

19         MR. GONZALEZ:  Very well.

03:20  20         THE INTERPRETER:  Oh, this is terrific, thank you.

21  **BY MR. GONZALEZ:**

22  Q.   Is it often the case, is it the protocol where passengers

23  are given these forms, and they're available at the airport?

24  A.   **Yes, sir, particularly if they have a question.  We'll give**

03:21  25  **this informational pamphlet to them.**

1  Q.   Now, you do not have an independent recollection as to

2  whether or not the form was given to Mr. Vallerius, correct?

3  A.   **No, sir, I do not.**

4  Q.   But it is a form that is commonly given out?

03:21  5  A.   **Yes, sir, it is.**

6  Q.   So after you asked Mr. Vallerius whether or not his

7  computer's password protected, what happens then?

8  A.   **Mr. Vallerius, as I recall, was asking some questions about**

9  **why this was needed.  And I provided him with an explanation**

03:21  10  **regarding the search of electronic devices.**

11  Q.   What was that explanation?

12  A.   **I explained to Mr. Vallerius that electronic devices are**

13  **nothing more than a container and that they are subject to**

14  **inspection much the same way that his luggage is subject to**

03:22  15  **inspection.**

16       **I told him that what we would be searching for is**

17  **either for contraband or evidence of criminal activity much in**

18  **the same way we inspect luggage.**

19  Q.   And did you give him examples of what may be contraband in

03:22  20  an electronic device?

21  A.   **Yes, sir, I did.  The most common example that I give**

22  **people is the possession of child pornography.  It's very**

23  **difficult for an electronic device to, say, contain an actual**

24  **object such as a kilo of cocaine or heroin, so I explained to**

03:22  25  **him that it would be something in a digital format such as**

1   child pornography.

2   Q.   So after telling him that you wanted to search his laptop,

3   and after telling him I want to search your laptop for

4   contraband, evidence of crime, things of that nature, what did

03:22  5   Mr. Vallerius do?

6   A.   **Mr. Vallerius provided his passwords without hesitation.**

7   Q.   And what did you do at that point, vis-a-vis the laptops

8   and the electronic devices?

9   A.   **I took the laptops and two cell phones and the electronic**

03:23  10  **tablet back to the seizure room where the two agents from DEA**

11  **were waiting.  And we began -- I provided them with the**

12  **passwords, and then they began the border search.**

13  Q.   You testified earlier that you have no -- really any area

14  of expertise in dark web marketplaces or cryptocurrencies or

03:23  15  things of that effect?

16        **THE INTERPRETER:**  I'm sorry, Mr. Gonzalez.  You're

17  getting faint again.  I'm sorry.  I need the question too.

18        **MR. GONZALEZ:**  Sure.

19  BY MR. GONZALEZ:

03:23  20  Q.   You testified earlier that you had no expertise in dark web

21  marketplaces or cryptocurrencies or things of that nature.

22        Consequently did you turn over the laptop to the DEA

23  agents that were there so that they can assist you in looking

24  at it to determine whether or not there was any contraband or

03:24  25  things of that nature?

A.   Yes, sir.  And I would add that that's not uncommon for us

to use subject matter experts.  And I have that under my

authority to ask another individual to assist me with my

inspection.

03:24  Q.   Very well.  And what happened after that?

A.   For myself I returned back out to the baggage secondary

area where Mr. and Mrs. Vallerius were located.  The DEA agents

began the inspection of the laptop.

Q.   And when you got back with Mr. Vallerius, what did you do?

03:24  A.   I don't have any specific recollection.  I'm sure we

engaged in some small talk, if you will.  I was asking him

about the beard competition, and generally just continued on

with the rest of the inspection of his luggage, but they had

very few items, so that didn't take very long.

03:25  Q.   And was that to give sufficient time to the DEA agent to go

ahead and look at the computer and determine what's going on?

A.   Yes, sir.

Q.   At any point up until this, had anybody ever told you we

are going to arrest Mr. Vallerius today?

03:25  A.   No determination --

THE INTERPRETER:  Can you repeat the question,

Mr. Gonzalez?

MR. GONZALEZ:  Sure.

BY MR. GONZALEZ:

03:25  Q.   Up until this point, had anyone ever told you we will be

1  arresting Mr. Vallerius today?

2  A.  **No determination had been made such as that.**

3  Q.  And had anyone told you there's already an arrest warrant

4  signed?

03:25  5  A.  **No, sir.  In fact, I was specifically told that an arrest**

6  **warrant had not been signed or a criminal complaint.**

7  Q.  So did there come a point in time when you spoke to the DEA

8  agents again concerning what, if anything, they had found with

9  the laptop?

03:26  10        **THE INTERPRETER:**  We cannot hear.  I'm so sorry.  We

11  hear the witness very well, but we don't hear the question.

12        **MR. GONZALEZ:**  Sure.  Let get me go ahead and repeat

13  it again.

14        **THE COURT:**  Did there come a point --

03:26  15        **MR. GONZALEZ:**  I got it.

16  **BY MR. GONZALEZ:**

17  Q.  Did there come a time when you went back to speak to the

18  DEA agents?

19  A.  **Yes, sir.  I went back into the room and asked them how --**

03:26  20  **what was the status of the inspection.  They informed me that**

21  **they had immediately found information on the laptop linking**

22  **him to the online profile that they were looking for and that**

23  **they had reason to believe that he was, in fact, the subject of**

24  **their investigations.**

03:26  25  Q.  And did they make any mention to you about a Bitcoin

1  wallet?

2  A.  **Yes, sir, they did.**

3  Q.  Do you recall --

4        **THE INTERPRETER:**  Can you repeat the question please,

03:27  5  and can you please stand closer to the place where the witness

6  is because we hear him fantastically well.

7        **THE COURTROOM DEPUTY:**  Your voice is trailing off.

8        **MR. GONZALEZ:**  I apologize.

9  **BY MR. GONZALEZ:**

03:27  10  Q.  Did they make any mention to you about a Bitcoin wallet?

11  A.  **Yes, sir, they did.  In fact, they asked me to return to**

12  **Mr. Vallerius and ask him for the password for the Bitcoin**

13  **account.**

14  Q.  Did you do that?

03:27  15  A.  **Yes, sir.  Mr. Vallerius said there was not a password**

16  **needed for the account.**

17  Q.  And did you convey that back to the DEA agents?

18  A.  **Yes, sir.**

19  Q.  And what happened generally after that?

03:27  20  A.  **The DEA agents were in communication with an assistant U.S.**

21  **attorney in this district.  I don't recall his name.  And they**

22  **were in contact with him and consultation to update him on the**

23  **status of the inspection.**

24        **And this was -- what I was picking up in the**

03:28  25  **conversation was they were trying to make the determination**

1  **what the next step was going to be in their investigation.**

2  Q.   And ultimately did there come a point in time when you were

3  told Mr. Vallerius would be arrested?

4  A.   **Yes, sir.**

03:28  5  Q.   And was he, in fact, arrested there in secondary?  Let me

6  be specific.

7       Was he moved from where his bag was being inspected at

8  the belt to another location?

9  A.   **Yes, sir.  We moved Mr. and Mrs. Vallerius to the far side**

03:28  10  **of the terminal, if you will.  It's about a 2-minute walk.  We**

11  **took him back over to my office, the office for Homeland**

12  **Security Investigations, inside the concourse.**

13  Q.   Now that is -- so we're clear chronologically -- is that

14  after the DEA had already told you there's evidence on the

03:29  15  computer linking him to the person that they were looking for

16  and the decision had been made to go ahead and arrest him?

17  A.   **Yes, sir.**

18  Q.   Let me backtrack a little bit.  And if you could tell us

19  what would be the procedure had Mr. Vallerius had told you I'm

03:29  20  not going to give you the password to my laptop?

21  A.   **In these types of incidents, I would explain to him what**

22  **would happen.  I explain to the passengers that we need the**

23  **password in order to conduct a cursory inspection of the**

24  **electronic device.**

03:29  25       **If we don't have the password, the device will need to**

1  be detained.  And if the device is detained, it will be

2  detained until a reasonable time that we can conduct the

3  inspection.

4  Q.  And, in fact, have there been instances where that has

03:30  5  occurred?

6  A.  **Yes, sir.  Quite often.**

7  Q.  After Mr. Vallerius was taken to your office, was he

8  questioned as to whether or not -- well, was he informed as to

9  what was going on in terms of his arrest?

03:30  10  A.  **Yes, sir.  Mr. --**

11         THE INTERPRETER:  In regard to what?  I'm sorry.

12  BY MR. GONZALEZ:

13  Q.  In regard to his arrest.  Was he told that he was going to

14  be placed under arrest?

03:30  15  A.  **Yes, sir.  He was told that he was going to be arrested.**

16  **And at this point, I want to just mention, he's not been**

17  **handcuffed at any point during this, when we moved him.  He was**

18  **not handcuffed.**

19         **So he was in our office, in my conference room, we**

03:31  20  **were using as an interview room, and he was told about what was**

21  **going on, and he was told that he was going to be arrested.**

22  Q.  In the entire time that he was in primary, was he

23  undergoing anything different than any other passenger would?

24  A.  **No, sir.**

03:31  25  Q.  When he was taken to secondary and his bags were put up on

1   the belt and he was being questioned and it was being

2   inspected, was that the same inspection process that everyone

3   else would go through that's going into secondary?

4   A.   **Absolutely, sir.**

03:31  5   Q.   Once he was told he was under arrest, did he ultimately

6   invoke his right and decide not to speak to you -- to you and

7   the other agents?

8   A.   **Yes, sir.  We sat down in an attempt to have an interview**

9   **with him.  He was advised of his Miranda Rights.  And he**

03:32 10  **indicated that he wanted to consult with an attorney,**

11   **specifically a Hebrew attorney.  And then questioning ceased.**

12   Q.   Did Mr. Vallerius speak English?

13   A.   **Yes, sir.**

14        **THE INTERPRETER:**   Can the question be repeated please?

03:32 15 **BY MR. GONZALEZ:**

16   Q.   Sure.  Did Mr. Vallerius speak English?

17   A.   **Yes, sir.**

18   Q.   Did you have any problems communicating with him?

19        **THE COURT:**   Change the channel, again, madam

03:32 20 interpreter.

21   **BY MR. GONZALEZ:**

22   Q.   Did you have any difficulties speaking with him?

23   A.   **None whatsoever, sir.**

24   Q.   And did you, in fact, undergo an exchange with him

03:32 25 concerning whether or not a Hebrew interpreter would be

1  available and whether or not notaries, Hebrew notaries in the

2  United States could give legal advice.  Do you recall that?

3  A.  **Yes, sir.  I do.  It was almost as if he was wanting to**

4  **talk with an attorney about signing the form.  He wasn't sure**

03:33  5  **if he was -- if he wanted to have an attorney for questioning.**

6  **But really it was reaching the point where the conversation**

7  **just ceased.**

8  Q.  And ultimately he was not questioned?

9  A.  **No, sir, he was not.**

03:33 10  Q.  Now, where was Mr. Vallerius' wife when this was going on?

11  A.  **She -- to better describe my office, I think a common term**

12  **was bull pen.  So she was just sitting out in the bull pen area**

13  **while we had him in the conference room.  We then moved her to**

14  **a private office where myself and one of the DEA agents**

03:33 15  **initiated an interview with her and read her Miranda and began**

16  **questioning.**

17  Q.  Ultimately was the decision made by the port authority or

18  the port officer that she could not stay in the United States,

19  and she was told she had to leave?

03:34 20  A.  **Mrs. Vallerius was deemed inadmissible into the United**

21  **States.**

22  Q.  And she was traveling under a different type of visa than

23  her husband, correct?

24  A.  **That's correct, sir.  She was traveling on a visitor's**

03:34 25  **non-immigrant visa, a B1 or B2, for business or pleasure.**

```
 1  Q.   And she was traveling under an Israeli passport, correct?
 2  A.   That's correct.
 3  Q.   And Mr. Vallerius was traveling under a French passport?
 4  A.   That is correct, sir.
 5           MR. GONZALEZ:  I have no further questions.
 6           THE COURT:  Thank you.  Cross-examination?  Slowly
 7  cross-examine.
 8           THE INTERPRETER:  The interpreter missed that.
 9
10                    CROSS EXAMINATION
11  BY MS. KRASNOFF:
12  Q.   Good afternoon, Agent Lewis?
13  A.   Good afternoon.
14  Q.   So you mentioned that you were not at primary when the
15  Valleriuses walked through; is that correct?
16  A.   That's correct.
17  Q.   You're not a CBP agent, right?
18  A.   CBP officer, no, ma'am, I'm not.
19  Q.   But you do know that a CBP officer stopped Mr. Vallerius
20  right at primary, right?
21           THE INTERPRETER:  I'm sorry.  Could the questioner
22  possibly be closer to the answerer and maybe a little slower
23  too so I can hear it?  Thank you.
24  BY MS. KRASNOFF:
25  Q.   Mr. Vallerius was stopped right at the customs desk at
```

03:34  5

03:35 15

03:35 20

03:35 25

1  primary, correct?

2  A.  **Yes, ma'am.  If you want I'll try to explain that to you.**

3        THE COURT:  Just to make my life easier, just answer

4  the question.  The question was a yes or no.

03:36  5  A.  Yes, sir.

6  **BY MS. KRASNOFF:**

7  Q.  And the reason for that is because the primary officer had

8  information that Mr. Vallerius should be stopped?

9  A.  **No, ma'am.  Every passenger has to present themselves to a**

03:36 10 **primary officer for admission to the United States regardless**

11 **of nationality.**

12 Q.  I should have been more clear.  He was stopped and sent to

13 secondary because there was a notation about him?

14 A.  **That is correct, ma'am.**

03:36 15 Q.  And that notation was based on an investigation done by the

16 DEA?

17 A.  **That notice was put in by myself based on the information**

18 **from the DEA, yes, ma'am.**

19 Q.  And that information, from what you received, regarded a

03:36 20 dark web cryptocurrency type investigation, correct?

21 A.  **Yes, ma'am.**

22 Q.  So that didn't involve any sort of immigration issue, any

23 sort of border security issue?

24 A.  **Ma'am, drug trafficking is a border security issue.**

03:37 25 Q.  Let me clarify.  It wasn't regarding a visa or a passport;

```
     1  it was specifically about a DEA investigation?

     2  A.  Yes, ma'am.

     3  Q.  And he was picked out due to this DEA investigation?

     4  A.  Yes, ma'am.

03:37 5  Q.  The reason that you became involved in the first place is

     6  because he was under DEA investigation?

     7  A.  He was under a joint investigation by HSI and DEA, yes,

     8  ma'am.

     9  Q.  Based on the information that DEA had?

03:37 10 A.  Yes, ma'am.

    11  Q.  So Mr. Vallerius is taken to a secondary inspection?

    12  A.  Yes, ma'am.

    13  Q.  Do you remember how many people were in that secondary

    14  inspection room on the day that Mr. Vallerius was there?

03:37 15 A.  No, ma'am.

    16  Q.  People are taken to that secondary inspection area for many

    17  reasons?

    18  A.  Yes, ma'am.

    19  Q.  It could be an immigration issue; it could be a DEA

03:38 20 investigation?  Lots of reasons somebody could be there?

    21  A.  No, ma'am.  The specific room that they were sent to is for

    22  baggage secondary inspection.  There's a separate secondary

    23  inspection area for immigration-related issues.

    24  Q.  Okay.  So he was in -- the Valleriuses were in this room

03:38 25 because their bags were going to be searched?
```

A.  **That is correct, ma'am.**

Q.  And the reason their bags would be searched was because they were part of the DEA investigation?

A.  **Yes, ma'am.**

03:38  Q.  This isn't optional, right?

A.  **No, ma'am, it's not.**

Q.  So what would happen if Mr. Vallerius says, no, you may not search my bag?

A.  **We would explain to Mr. Vallerius that his bags would be**
03:39  **searched, and it would be explained to him that we don't**
**require his consent to search his bags.**

Q.  And you mentioned that when you searched the bag you took out the laptop and the other devices?

A.  **Yes, ma'am.  Actually I think what happened is I asked them**
03:39  **if they had electronic devices, and they presented them.  They**
**pointed out in the luggage where those devices were.**

Q.  When you received those devices or when you obtained them from the bags, did you then go to a separate room prior to asking for the passwords?

03:39  A.  **As I recall I asked for the passwords prior to taking the**
**devices to the seizure room to conduct the inspection.**

Q.  And you mentioned that there is a form that is typically given to people whose electronics will be searched?

A.  **Yes, ma'am.  The form is for those people who have**
03:39  **questions or are reluctant to turn over their devices.**

```
 1  Q.   Is that form available in the Hebrew language?

 2  A.   Not that I'm aware of, no.

 3  Q.   And you're not sure if Mr. Vallerius received that form?

 4          THE INTERPRETER:  Sorry.  You're not sure if

 5  Mr. Vallerius received what?

 6  BY MS. KRASNOFF:

 7  Q.   Received that form?

 8  A.   No, ma'am, I don't recall if he was.

 9  Q.   So prior to going to the seizure room you asked

10  Mr. Vallerius for his password?

11  A.   Yes, ma'am.

12  Q.   And you told him that you -- the most common reason to

13  search these items is child pornography?

14  A.   I don't believe I told him that the most common reason is

15  child pornography.  I used that as an example.

16  Q.   Did you mention any other examples?

17  A.   No, ma'am.

18  Q.   So did you mention information relating to narcotics?

19  A.   No, ma'am.

20  Q.   So the only example used was child pornography?

21  A.   Yes, ma'am.

22  Q.   You discussed with Mr. Gonzalez what would happen if

23  somebody said I'm not giving you the password.  And what you

24  explained was that the items would be seized, the person would

25  be either turned around or arrested, depending on the case, and
```

03:40 5
03:40 10
03:40 15
03:40 20
03:41 25

1  the items would be held for a reasonable amount of time until

2  they could be opened?

3  A.  **Correction, ma'am.  I said detained.  The legal status is**

4  **to detain the items.**

03:41  5  Q.  I apologize.  Detained?

6  A.  **Yes, ma'am.**

7  Q.  So they would be detained until they could be opened?

8  A.  **That is correct.**

9  Q.  Do you have knowledge of the procedures that are taken to

03:41  10  open a laptop?

11  A.  **Yes, ma'am.**

12  Q.  And so are you aware of what would need to be done on a

13  laptop like Mr. Vallerius' to crack the code or break the

14  password?

03:41  15  A.  **I'm vaguely familiar with what the forensic agents would**

16  **need to employ; that there is a process --**

17        THE INTERPRETER:  Sorry.  The interpreter missed the

18  answer.

19        THE COURT:  Could you answer?

03:42  20  A.  **Yes.  I'm vaguely familiar with the process as a whole the**

21  **forensic agents would use to examine the computer.**

22  BY MS. KRASNOFF:

23  Q.  You are not a forensic agent, correct?

24  A.  **I have been trained, but I'm not currently a forensic**

03:42  25  **agent.**

1  Q.   So I imagine that the length of time and the difficulty

2  depends on each individual laptop?

3  A.   **I'm not sure I'm qualified to answer that.**

4  Q.   Well, if there were extra barriers put up, it would be more

03:42  5  difficult, correct?  Extra walls, extra passwords?

6  A.   **I would imagine.**

7  Q.   And so without yourself examining the laptop or speaking

8  with a forensic agent, you don't have any way to know whether

9  or not they would have eventually -- or how long it would take

03:42  10  to get into the laptop?

11  A.   **No, ma'am, I don't know.**

12  Q.   When Mr. Vallerius was sitting in secondary, he's not free

13  to go at that point, right?

14  A.   **He is not free to leave the secondary inspection area**

03:43  15  **because he's not been admitted to the United States.**

16  Q.   If he said, I want to go back to France; I'll buy the

17  ticket; give me my bags; I'm out.  Would that be okay?

18  A.   **No, ma'am, because his bags are still subject to**

19  **inspection, and he is still subject to inspection because he**

03:43  20  **has entered into the United States, but he has not been**

21  **admitted.**

22  Q.   And there are agents that are inside of that inspection

23  room, correct?

24  A.   **There are CBP officers inside that inspection room.**

03:43  25  Q.   To make sure that nobody tries to leave the inspection

1  room?

2  A.  **Yes, ma'am.**

3  Q.  What would happen if he did try to leave the inspection

4  room?

03:43  5  A.  **He would be detained.**

6  Q.  When you call a secondary inspection routine, what does

7  that mean?

8  A.  **I'm sorry, ma'am.  In what context?**

9  Q.  If you were to write in a report subject to routine

03:44  10  secondary inspection, what does that mean?  What does the

11  routine part mean?

12  A.  **It means that it is routine.  As an agent assigned to the**

13  **airport, I get numerous requests from a variety of law**

14  **enforcement agencies to conduct a secondary inspection.  It's**

03:44  15  **really not outside the ordinary to select someone for secondary**

16  **inspection.**

17  Q.  Is there any point where a secondary inspection becomes not

18  routine?

19  A.  **No, ma'am.**

03:44  20  Q.  So every inspection that's done in that area, you would

21  consider routine or the norm?

22  A.  **Yes, ma'am.**

23  Q.  You mentioned that when the laptop and the devices were

24  taken and removed, they went to -- I think it was the seizure

03:45  25  room?

1  A.   **Yes, ma'am.  We refer to it as the seizure room.**

2  Q.   The seizure room.  And you gave the passwords to Agent

3  Infante?

4  A.   **Yes, ma'am.**

03:45  5  Q.   And at that point you left the room?

6  A.   **Yes, ma'am.**

7  Q.   You did not see them put in the password?

8  A.   **No, ma'am.**

9  Q.   And you did not see the order of which they opened anything

03:45  10  on the laptop?

11  A.   **No, ma'am.**

12  Q.   And you did not see anything that they found on the laptop?

13  A.   **No, ma'am.**

14  Q.   When you were given the information by Agent Infante

03:45  15  regarding the Bitcoin, were you also told that there was

16  $500,000 worth of Bitcoin on the wallet on the computer?

17  A.   **At some point I became aware of that.  But that -- I was**

18  **informed of that, but I don't know when it was.**

19  Q.   Did you ask Mr. Vallerius about the amount of Bitcoin on

03:45  20  the computer?

21  A.   **At some point I may have.  I don't believe it was at that**

22  **point because I didn't find out until later in the inspection**

23  **process.**

24  Q.   Do you remember when it was in the inspection process?

03:46  25  A.   **No, ma'am.**

```
        1  Q.   When he was taken into the office or the sort of the
        2  more-private area?
        3  A.   Yes, ma'am?
        4  Q.   Was he immediately read Miranda?
03:46   5  A.   No, ma'am.
        6  Q.   There were questions asked of him prior to that?
        7  A.   No, ma'am.
        8  Q.   Did he speak to any agents or officers prior to that?
        9  A.   No, ma'am.
03:46  10  Q.   Was it after Miranda was read that you asked him the
       11  questions about the $500,000 in Bitcoin?
       12  A.   No, ma'am.  I think the -- I don't recall asking him a
       13  question about $500,000 in Bitcoin.  That information was
       14  provided to me by the DEA agents.  I don't recall asking him
03:46  15  about a specific amount of Bitcoin.
       16  Q.   There's a video at some point.  A video recorder was turned
       17  on in that room?
       18  A.   An audio recorder?
       19  Q.   An audio recorder.  I apologize.  And it's at the time that
03:47  20  Miranda is given.
       21       Was there any conversation, any questions that
       22  happened prior to that being turned on?
       23  A.   Not that I'm aware of.
       24       MS. KRASNOFF:  May I have one moment, Your Honor?
03:48  25  BY MS. KRASNOFF:
```

1  Q.   I want to go back to what you knew before Mr. Vallerius was

2  stopped.  Do you know how the DEA learned when Mr. Vallerius

3  would be coming?

4           THE COURTROOM DEPUTY:  He needs to --

03:48  5           MS. KRASNOFF:  Go back to the foreign language.

6           THE INTERPRETER:  I'm sorry.

7  BY MS. KRASNOFF:

8  Q.   I missed the answer if there was one.

9  A.   **I didn't get a chance to respond.  I don't -- I'm not sure**

03:48 10  **how they found out his initial travel itinerary.**

11  Q.   Do you know how they identified Mr. Vallerius as a suspect

12  in a DEA investigation?

13  A.   **No, ma'am.  I'm not privy to that.**

14  Q.   You said that Mr. Vallerius matched a photograph that you

03:49 15  had of him?

16  A.   **Yes, ma'am.  I believe I had a chance to look at a passport**

17  **photograph.  The databases that we have will sometimes have**

18  **photographs.**

19  Q.   Were you given a photograph by the DEA?

03:49 20  A.   **No, ma'am.**

21  Q.   Had you not --

22           THE INTERPRETER:  I'm sorry.  May I have the last

23  question again?

24  BY MS. KRASNOFF:

03:49 25  Q.   Were you given a photograph by the DEA?

```
       1  A.  No, ma'am.

       2  Q.  Had you not been alerted by the DEA, would there have been

       3  any reason to stop Mr. Vallerius?

       4  A.  I'm not sure I understand your question.  Yes, there could

03:49  5  have been reasons to stop him.  We could have developed

       6  information independently.

       7  Q.  Was there anything that you did develop independently?

       8  A.  No, ma'am.

       9  Q.  Was there any problem with his passport?

03:50 10  A.  No, ma'am.

      11  Q.  You mentioned that Mr. Vallerius was put in the blue folder

      12  area?

      13  A.  Yes, ma'am.

      14  Q.  What does the blue folder mean?

03:50 15  A.  It's just for administrative purposes.  There are several

      16  different-colored folders.  Blue is just for baggage secondary.

      17  Yellow might be for an immigration-related issue.  Green is for

      18  an agricultural-related issue.

      19  Q.  The passport photo that you mentioned about Mr. Vallerius?

03:50 20  A.  Yes, ma'am?

      21  Q.  Did he look the same as he does today?

      22  A.  Yes, ma'am.

      23  Q.  Did he have a full beard in that photo?

      24  A.  I don't specifically recall.

03:50 25  Q.  Is it possible he was clean shaven in that photograph?
```

A.   **It's possible.**

Q.   Was there a time where you had a conversation with

Mr. Vallerius where he told you that having Bitcoin is not

illegal?

03:51  A.   **Yes, ma'am.**

Q.   What was the question that prompted that response?

A.   **I don't specifically recall.  I know that he and I were**

**discussing Bitcoin.  I believe this was when we were asking for**

**the password for the Bitcoin account.  And he was saying that**

03:51  **it's not illegal.  And I replied that, no, it's not illegal to**

**have a Bitcoin.**

Q.   Was there anything else that he said at that point?

A.   **I don't recall.**

Q.   When you removed the devices, the laptop was opened first?

03:51  A.   **I don't know which device was opened first.**

Q.   Is everybody's laptop opened?

A.   **When they come into the secondary baggage area?**

Q.   When they come through customs?

A.   **No, not every laptop is inspected.**

03:52  Q.   So it's folks who are flagged and sent to secondary?

A.   **Not always.  There are a lot of passengers who are selected**

**at random.**

Q.   And so not everybody in secondary would have their laptop

inspected?

03:52  A.   **No, ma'am.**

```
          1         MS. KRASNOFF:  One moment, please.

          2   BY MS. KRASNOFF:

          3   Q.  When you initially took the laptop, how did you know that

          4   there would be a password on it?

03:53     5   A.  I didn't.

          6   Q.  Was it opened prior to you asking for the password?

          7   A.  Now, do you mean to open it to look at files, or to open

          8   the lid to expose the keyboard?  Can you please clarify?

          9   Q.  Of course.  So when you physically open the laptop?

03:53    10   A.  Yes, ma'am?

         11   Q.  And it turns on, it pops up that it's password protected to

         12   even get to the desktop, correct?

         13   A.  Yes, ma'am.

         14   Q.  So was the laptop physically opened prior to you asking for

03:54    15   a password?

         16   A.  No, ma'am.  When I take electronic devices, I always ask is

         17   there a password.  If there is, I ask for the password.

         18   Q.  Was the device, the laptop or the phone, brought to agent

         19   Infante prior to you asking for the password?

03:54    20   A.  No, ma'am.

         21   Q.  Thank you.

         22         THE COURT:  Redirect?

         23

         24                 _REDIRECT EXAMINATION_

03:54    25   BY MR. GONZALEZ:
```

```
 1   Q.   I want to ask you some questions about routine secondary
 2   inspections.
 3   A.   Yes, sir.
 4   Q.   Are they routine that they occur every day?
 5   A.   Yes, sir.
 6   Q.   Are they routine enough that they occur multiple times a
 7   day?
 8   A.   Yes, sir.
 9   Q.   Are they routine enough that there is a special room in the
10   airport set aside just for secondary inspections?
11   A.   Yes, sir.
12   Q.   Are they routine enough --
13            THE INTERPRETER:  I'm sorry.  The interpreter missed
14   that.
15   BY MR. GONZALEZ:
16   Q.   Are they routine enough that they occur every day in the
17   airport?
18   A.   Yes, sir.
19            MR. GONZALEZ:  I think you need to switch to the other
20   line.
21            THE INTERPRETER:  Sorry.
22   BY MR. GONZALEZ:
23   Q.   Are they routine enough that they occur multiple times
24   every day at the airport?
25   A.   Yes, sir.
```

Timestamps (left margin): 03:54 at line 5; 03:55 at line 10; 03:55 at line 15; 03:55 at line 20; 03:55 at line 25

1  Q.   Are they routine enough that a special room just for

2  secondary inspections was set up?

3  A.   **Yes, sir.**

4  Q.   Are they routine enough -- showing you government's

03:55  5  Exhibit 1, government's Exhibit 2, that there are multiple

6  stations to simultaneously do routine secondary inspections?

7  A.   **Yes, sir.**

8  Q.   Showing you government's Exhibit 3 and government's

9  Exhibit 5, are they routine enough that there are chairs for

03:56  10  people to sit while they wait for it to be their turn to go

11  through a routine secondary inspection?

12  A.   **Yes, sir.**

13  Q.   And while you testified on cross-examination that you

14  couldn't say how many people were in the room during the

03:56  15  secondary inspections, you testified when I asked you that

16  Mr. Vallerius was told to sit down and wait until he was

17  called, correct?

18  A.   **Yes, sir.**

19  Q.   Now, you were also asked whether or not there were any

03:56  20  questions that were asked prior to the recording device being

21  turned on.  Do you remember being asked that question?

22  A.   **Yes, sir.**

23  Q.   In that room, were there any questions that were asked

24  prior to the recorder being turned on?

03:57  25  A.   **No, sir.**

1  Q.   Going back though to the secondary inspection, was

2  Mr. Vallerius asked questions as part of the inspection?

3  A.   **Yes, sir.**

4  Q.   And going back to the initial inspection, would he have

03:57  5  been asked questions there?

6  A.   **Yes, sir.**

7  Q.   And lastly, to make sure that we're clear, that -- did you

8  ever speak to the first officer that did -- prior to him seeing

9  Mr. Vallerius, prior to him talking to Mr. Vallerius, did you

03:57  10  speak to that officer that did the primary inspection?

11  A.   **No, sir.**

12  Q.   Did you, however, put a notation in the computer system

13  that would come up whenever, whatever officer it was, would run

14  Mr. Vallerius?

03:57  15  A.   **Yes, sir.**

16  Q.   And did that contain details of the investigation, or did

17  it simply say send to secondary?

18  A.   **It would have said send to secondary, and it may have had a**

19  **one-line justification, but it would not have had specifics.**

03:58  20  Q.   About the investigation?

21  A.   **Correct, sir.**

22       **MR. GONZALEZ:**  No further questions, Your Honor.

23       **THE COURT:**  Thank you, sir.  You may step down

24  carefully.

03:58  25       **THE WITNESS:**  Yes, sir.

1          THE COURT:  Any additional witness you wish to call at

2    this point, Mr. Gonzalez?

3          MR. GONZALEZ:  Again it depends on who has the burden

4    at this point.

03:58   5          THE COURT:  Right.

6          MR. GONZALEZ:  Are we, by de facto, with the burden?

7          THE COURT:  At this point I may talk to Mr. Natale

8    first.

9          MR. NATALE:  Your Honor, then we would call --

03:58  10          THE INTERPRETER:  I'm sorry.  The interpreter didn't

11    hear the answer of the judge.

12          THE COURT:  Go ahead.

13          MR. NATALE:  Your Honor, we would call Special Agent

14    Infante.

03:59  15          THE COURT:  And this would be relevant to?  Just so I

16    know.

17          MR. NATALE:  This is going to be relevant to the

18    information as far as the stopping of Mr. Vallerius and what

19    was done with the computer and when it was done.

03:59  20          THE COURT:  Okay.

21          MR. NATALE:  Your Honor, for purposes to expedite

22    this, may I use somewhat-leading questions?

23          MS. ALDEN-PELKER:  Your Honor, the government's

24    position would be that if defense wants to --

04:00  25          MS. KRASNOFF:  I don't think you finished your point.

1          **MS. ALDEN-PELKER:**  I apologize.  I thought the

2  marshals were asking me to stop talking.  If the defense

3  counsel would like to call Agent Infante, they can ask

4  open-ended questions; then we can lead on cross.

04:00    5          **THE COURT:**  Yeah.  Let's swear in the witness.

6  Thereupon,

7                              **LILITA INFANTE,**

8  having been duly sworn by the courtroom deputy, testified as

9  follows:

04:00   10          **THE WITNESS:**  I do.

11          **THE COURTROOM DEPUTY:**  Please have a seat, ma'am, and

12  state and spell your name for the record.

13          **THE WITNESS:**  Lilita Infante.  L-I-L-I-T-A,

14  I-N-F-A-N-T-E.

04:00   15          **THE COURT:**  Your agency, ma'am?

16          **THE WITNESS:**  Drug Enforcement Administration.

17          **THE COURT:**  Since I think it would expedite matters

18  and it's only an evidentiary hearing as opposed to a trial, I'm

19  going to grant Mr. Natale's request.  You can lead if you wish.

04:00   20          **MR. NATALE:**  Thank you, Your Honor.

21

22                        _**DIRECT EXAMINATION**_

23  BY MR. NATALE:

24  Q.   Special Agent Infante, I'd like to direct your attention to

04:01   25  -- prior to August 25th, of 2017, there are many things that

1   were said about Mr. Vallerius and the dark market in the

2   application for the search warrant and in the complaint, the

3   arrest complaint in this case, which referred to instances

4   prior to August -- well, prior to Mr. Vallerius coming into the

04:01   5   United States, correct?

6   A.   **Yes, that's correct**.

7   Q.   And you are aware of those affidavits, are you not?

8   A.   **Yes, sir**.

9   Q.   And you had a chance to review those affidavits?

04:01   10   A.   **Yes, sir**.

11       **MR. NATALE:**  Your Honor, I would like to ask you to

12   take judicial notice so I can have them introduced as defense

13   Exhibit 1 and defense Exhibit 2.

14       **MS. ALDEN-PELKER:**  No objection, Your Honor.

04:02   15       **THE COURT:**  All right.  Defense 1 and 2 will be

16   admitted.

17       (Thereupon, the exhibit was admitted into evidence.)

18   **BY MR. NATALE:**

19   Q.   Without going through every single paragraph, this was a

04:02   20   continuous and ongoing investigation of Dream Market and other

21   dark web markets; is that correct?

22   A.   **Of Dream Market, yes, sir**.

23   Q.   And as a result of that and the investigation, you were

24   able to connect "OxyMonster" to a tip jar and then to a wallet

04:02   25   that was in the possession of and control of Mr. Vallerius?

1  A.   **That's correct.**

2  Q.   Now, you then utilized open source information from

3  Instagram and -- what's the other?  Instagram and -- I forgot

4  the other one.

04:03  5  A.   **Twitter.**

6  Q.   Twitter.  Twitter.  I apologize.  And then you were able to

7  sort of get a picture of Mr. Vallerius, correct?

8  A.   **Yes, that's correct.**

9  Q.   And prior to that --

04:03  10       **THE COURT:**  If you could delay a little bit between

11  the question and the answer, it will help the interpreter.

12       **AGENT:**  Sure.

13  **BY MR. NATALE:**

14  Q.   And prior to Mr. Vallerius coming the United States, either

04:03  15  you or someone at your direction or someone as part of the

16  investigation compared the -- for lack of a better term -- the

17  syntax and writing of the person who was identified as

18  "OxyMonster" with the individual that was identified as

19  Mr. Vallerius, correct?

04:04  20  A.   **Yes.**

21  Q.   And the conclusion was that they were similar linguistic

22  characteristics to what was said and how it was said?

23  A.   **Yes, that's correct.**

24  Q.   And this is everything that you knew prior to Mr. Vallerius

04:04  25  -- prior to you know knowing that Mr. Vallerius was coming the

1  United States, right?

2  A.  **Yes, that's correct.**

3  Q.  Now, you learned that he was coming to the United States;

4  is that correct?

04:04  5  A.  **Yes.**

6  Q.  Did you utilize any search warrants, any taps, or any sort

7  of intrusions into any electronic data, e-mails, Snapchat,

8  Instagram, or Twitter in order to make that determination?

9  A.  **We did not have any search warrants, but we did get**

04:05  10  **information from the company called LocalBitcoins.  It's a**

11  **company in Finland.  And that's where Mr. Vallerius had his**

12  **Bitcoins.**

13  Q.  And that information was that he was going to be coming to

14  the United States on August 31st?

04:05  15  A.  **No.  That information I received from our HSI counterparts.**

16  Q.  I'm sorry?

17  A.  **That information I received from our HSI counterparts.**

18  Q.  When you say HSI counterparts, they were people who were

19  instructed to see if Mr. Vallerius was going to be travel, or

04:05  20  how would they even know that he was, quote, on the radar?

21  A.  **Yes.  I requested that our HSI partners check their**

22  **databases that they often used to check travel records for**

23  **targets.**

24  Q.  And at some point you were told that arrangements had been

04:06  25  made for he and his wife to come to the United States?

1  A.  **Yes, that's correct.**

2  Q.  And I believe that was approximately August 25th?

3  A.  **I don't recall the exact date.  Around that time, yes.**

4  Q.  And then sometime after that, a few days later, I believe

04:06  5  it was August 29th, you made contact with Homeland Security and

6  border patrol -- Customs and Border Patrol to say this person's

7  coming in, we would like to have him detained and to go through

8  his information, his luggage, and the like, right?

9  A.  **I told him that he was coming in, and we would like to meet**

04:06  10  **him at the airport and see what he has.**

11  Q.  Well, isn't it that you wanted to see what he had in his

12  luggage, whether he had a laptop, whether he had phones, and

13  that you wanted to be able to look into those to see if there

14  was any evidence of criminal activity?

04:07  15  A.  **Yes.**

16  Q.  So the idea was we're doing a drug investigation, and we

17  want for you to stop him when he comes in, so we can search his

18  phones and laptop to see if there is further evidence of a

19  crime which we think that he's participating in, right?

04:07  20  A.  **To see if there's any evidence of any crime, yes.**

21  Q.  Now, prior to stopping Mr. Vallerius at the airport, you

22  had no idea whether he was coming in with any electronic

23  devices?

24  A.  **Yes, that's correct.**

04:07  25  Q.  And, in fact, until you were able to get into those

1   electronic devices, you had no knowledge as to whether there

2   was a nexus between the information you had before that would

3   connect the information you had before in any way to the

4   instruments, the devices that he now had in Atlanta?

04:08  5   A.  **Not definitively, but I did guess, based on past**

6   **experience, that dark web vendors do use their personal laptops**

7   **for their criminal activity.**

8   Q.  Well, and you've also learned that they may have many

9   personal laptops?

04:08  10  A.  **Yes.**

11  Q.  And my specific question is you had no information or data

12  which showed that the computer and any of the electronic

13  devices he had were utilized in the illegal activities that you

14  had previously documented, correct?

04:08  15  A.  **Yes.**

16  Q.  And it wasn't until you were able to get into those items

17  that you were able to see that there was, in fact, evidence

18  that would connect to what you were previously investigating?

19  A.  **That's correct.**

04:09  20  Q.  And you would agree that, in light of that, there was no

21  way that you would have been able to get a search warrant for

22  Mr. --

23        **MS. ALDEN-PELKER:**  Objection, Your Honor.  It's

24  calling for speculation.

04:09  25        **THE COURT:**  Well, he didn't finish his speculative

1    question.

2                              (Laughter)

3    **BY MR. NATALE:**

4    Q.   Agent, have you ever applied for a search warrant?

04:09   5    A.   **Yes, sir.**

6    Q.   And when you apply for a search warrant, is it custom to

7    say the items that you want to search?

8    A.   **Yes, sir.**

9    Q.   And is it customary and, in fact, required to show that

04:09  10   there is a relationship between the specific items you

11   identified and specific criminal activity?

12   A.   **Yes, sir.**

13   Q.   And that there is a realistic expectation that at the

14   current time, the proceeds of or instrumentality of the

04:10  15   criminal activity would be contained in that specific location,

16   correct?

17   A.   **Yes.**

18   Q.   Now, prior to going into Mr. Vallerius' computer, you had

19   none of that information specifically as it related to the

04:10  20   electronic devices that were ultimately seized?

21   A.   **I wouldn't really know about probable cause because we**

22   **didn't get a search warrant, so there was no court-approved**

23   **probable cause.**

24        **But in the past I have gotten search warrants for**

04:10  25   **electronics of individuals without specifically tying that**

**specific electronic device to the crime based on the fact that**

**most individuals that do business on the dark web do utilize**

**their personal electronic devices for that purpose.**

Q.   So there was a specific choice on your part not to engage

in the procedure of getting the warrant which you just said you

had previously done and to rely on the border search; is that

correct?

A.   **We did end up getting a warrant later.**

Q.   I'm saying prior to getting the warrant.

A.   **That's correct.**

Q.   Now, as it relates to the receiving of the laptop, you were

presented with a laptop by Special Agent Lewis, correct?

A.   **Yes.**

Q.   And you were provided with it, and you physically opened

it, turned it on, and discovered that it was password

protected?

A.   **Yes, that's correct.**

Q.   And you then asked him to go and ask Mr. Vallerius for the

password?

A.   **As far as I recall, we already had the password when I**

**opened the computer.**

Q.   And you had the password because Mr. Vallerius had been

told that they were looking for child pornography?

         **MS. ALDEN-PELKER:**  Objection, Your Honor.  The witness

hasn't testified and has no personal knowledge of what Agent

         1   Lewis told the defendant.

         2            **MR. NATALE:**  Let me ask you --

         3            **THE COURT:**  Sustained.

         4   **BY MR. NATALE:**

04:12    5   Q.   Are you aware of what Agent Lewis said to Mr. Vallerius in

         6   order to get the password?

         7   A.   **I'm not aware of the exact phrase he used as I did not hear**

         8   **it.**

         9   Q.   Now, you certainly were not looking for child pornography,

04:12   10   were you?

        11   A.   **No, sir.**

        12   Q.   Now, after opening the laptop, did there come a time when

        13   you then were presented with the cell phones, correct?

        14   A.   **Yes.**

04:13   15   Q.   And they were also password protected?

        16   A.   **Yes.**

        17   Q.   And Mr. -- excuse me -- special Agent Lewis provided you

        18   with the passwords to those?

        19   A.   **That's correct.**

04:13   20   Q.   So you first look into the laptop -- and now, when you look

        21   into the laptop, and you put in the password, there is what we

        22   call a desktop that pops up?

        23   A.   **Yes.  That's correct.**

        24   Q.   I'd like to show you what has been marked as defense

04:13   25   exhibit for identification Number 3?

1         **MR. NATALE:**  Your Honor, may I approach?  I'm showing

2    my age.  Let the record reflect the judge was nodding in

3    affirmance.

4         (Thereupon, the exhibit was marked for identification.)

04:14  5    **BY MR. NATALE:**

6    Q.   Agent, can you see what I've placed on the ELMO, which I

7    believe is in front of the TV screen in front of you?

8    A.   **Yes, sir.**

9    Q.   Do you recognize that?

04:14 10    A.   **Yes, sir.**

11    Q.   And what do you recognize that to be?

12    A.   **The desktop of Mr. Vallerius' computer.**

13    Q.   And that's how it appeared to you once you entered the

14    password?

04:14 15    A.   **Yes, sir.**

16    Q.   Now, once you entered the password, it's fair to say that

17    you were not looking for child pornography, right?

18    A.   **Sure.**

19    Q.   And it's fair to say that the only thing that you were

04:14 20    really looking for was something to connect Mr. Vallerius to

21    the dark web Dream Market, right?

22    A.   **Any criminal activity, yes.**

23    Q.   Criminal activity?

24    A.   **Yes.**

04:15 25    Q.   But that was the criminal activity you were looking for,

1    correct?

2    A.   **Yes.**

3    Q.   And just so we know, Bitcoin, it is not illegal for someone

4    to have Bitcoin?

04:15   5    A.   **No.**

6    Q.   So that, in and of itself, is not contraband, nor is it

7    necessarily the proceeds of criminal action?

8    A.   **That's correct.**

9    Q.   Now, there was also a key, in fact, it even looks like a

04:15  10    key.  Do you recall seeing that?

11    A.   **Yes.**

12    Q.   And that's what they call a PGP encryption?

13    A.   **Yes.**

14    Q.   And that's a way to, like, encrypt stuff, right?

04:15  15    A.   **Yes.**

16    Q.   And what happened was you clicked onto that, right?

17    A.   **Yes.**

18    Q.   And that enabled you to get certain information which

19    otherwise would not be available just by looking at the desktop

04:16  20    which we have as Exhibit 3, defense Exhibit 3?

21    A.   **Yes.**

22    Q.   Now, you then proceeded to look further, and you went into

23    the Bitcoin wallets, correct?

24    A.   **Yes.**

04:16  25    Q.   And when you went into the Bitcoin wallets, there was a

          1   need to have a particular password to get into that, right?
          2   A.   **No, not to look at it.**
          3   Q.   Exactly.  So you could look at it.  And when you looked at
          4   it, you noticed that there was a large number of Bitcoins,
          5   correct?
          6   A.   **Yes.**
          7   Q.   And that based on your knowledge and experience, you
          8   probably did a quick check on the internet and see how much
          9   that was worth?
  04:16 10   A.   **Yes.**
         11   Q.   And it was approximately $500,000?
         12   A.   **Right.**
         13   Q.   And that was something that you communicated to Special
         14   Agent Lewis and other agents, correct?
  04:17 15   A.   **Yes.**
         16   Q.   And it was, you know, talked about that that was a large
         17   amount of money?
         18   A.   **Yes.**
         19   Q.   Now, you then looked further into the computer, correct?
  04:17 20   A.   **Yes.**
         21            **THE INTERPRETER:**  Sorry.  You then what?
         22            **MR. NATALE:**  Looked further into the computer.
         23   A.   **Yes.**
         24            **MR. NATALE:**  Your Honor, I'd like to move defense
  04:17 25   Exhibit 3 into evidence.

1      **MS. ALDEN-PELKER:**  No objection.

2      **THE COURT:**  Defense 3 will be admitted.

3      (Thereupon, the exhibit was admitted into evidence.)

4   **BY MR. NATALE:**

04:17   5   Q.   Now, I'd like you to look at defense Exhibit 3, and there

6   was a -- there is a text icon that says --

7      **THE INTERPRETER:**  Interpreter can't hear.  Sorry.

8   **BY MR. NATALE:**

9   Q.   There is a text icon that says schedule.

04:18  10   A.   **Yes.**

11   Q.   You clicked onto that and gained further information?

12   A.   **Right.**

13   Q.   There is nothing in and of itself by seeing schedule that

14   would indicate that it contained anything to do with child

04:18  15   pornography, Bitcoin, or anything else?

16   A.   **Right.**

17   Q.   It was just to see what was in there?

18   A.   **Right.**

19   Q.   Now, there is also another one that says Bitcoin on here.

04:18  20   It's on the lower right-hand corner of defense Exhibit 3.  Did

21   you see that?

22   A.   **The folder?**

23   Q.   Yes.

24   A.   **Yeah.**

04:19  25   Q.   And you also went into that, didn't you?

 1  A.   **No, not on that one.**

 2  Q.   Now, the Bitcoin can be held in wallets, right?

 3  A.   **Yes.**

 4  Q.   And they're computer wallets.  They're not like what you

 5  would carry in your pocket, correct?

 6  A.   **Yes.**

 7  Q.   It's a digital construction?

 8  A.   **Right.**

 9  Q.   And his was synchronized to internet access, wasn't it?

10  A.   **Yes.**

11  Q.   Because once you went into that, at some point, you

12  actually asked him for a password so it could be transferred

13  into the IRS account for safekeeping, right?

14  A.   **Yes.  Actually I think you were pointing to the wrong**

15  **folder.  It was actually the icon on the left that has the**

16  **star-type shape to it.**

17  Q.   Okay.

18  A.   **Right next to the keys, that's the electronic wallet.**

19  Q.   I apologize.

20  A.   **And I did open that, yes.**

21  Q.   And you opened that one as well?

22  A.   **Yes.**

23  Q.   And that connected to the internet, correct?

24  A.   **It wasn't connected to the internet at the time.**

25  Q.   Wasn't his computer connected to the WiFi, which is present

1   at the Atlanta International Airport?

2   A.   **I don't think so.   I can't recall exactly.   I don't think**

3   **so.**

4   Q.   Well, I thought you testified earlier that you went on the

04:20   5   internet and you found out the value of the number of Bitcoins,

6   and it was approximately $500,000?

7   A.   **I didn't use Mr. Vallerius' internet.**

8   Q.   You used --

9   A.   **My phone.**

04:20   10   Q.   Now, after you went through the computer, there was a great

11   deal of information that you now had that linked the computer

12   to what you were investigating were the illegal drug activities

13   on Dream Market?

14   A.   **Yes.**

04:21   15   Q.   After you did your search into what was in there, that we

16   just described, was the first time that you knew for sure that

17   at least this laptop was, in fact, used in order to conduct

18   illegal activities?

19   A.   **Yes.**

04:22   20   Q.   And when we go through the cell phones, the same thing is

21   true?   And let me tell what you I mean by that.   That it wasn't

22   until you were able to go into those cell phones that you were

23   able to determine that they contained information that was

24   related to the investigation that you were conducting to

04:22   25   "OxyMonster" and to Mr. Vallerius and to Dream Market, correct?

A.    **Correct.**

Q.    Prior to that, there was no knowledge that you had?

A.    **About those specific devices, no.**

Q.    Exactly.  And after you received that information is

04:22    when -- and I know you did not write the complaint.  I

understand that that was Special Agent Austin Love.  And I

understand that you did not file the search warrant, the

request for the search warrant.  That I believe was by Special

Agent Santiago?

04:23 10    A.    **Yes.**

Q.    But yet you're aware of the information that's contained in

there?

A.    **Yes, sir.**

Q.    Now, in those documents, the only reference which shows

04:23 15    that these particular items were connected to the illegal

activity that is described within the complaint and within the

affidavit for the search warrant is what you discovered from

the search of those items in Atlanta, correct?

A.    **Yes, correct.**

04:24 20          MR. NATALE:  Your Honor, may I have a moment?

**BY MR. NATALE:**

Q.    Is it fair to say that you have a familiarity with

computers and wallets and Bitcoins and the internet?

A.    **Yes, sir.**

04:24 25    Q.    Now, in order to go to the location through his computer

1   for the transfer of Bitcoin, you would have to be connected to

2   the internet, correct?

3   A.   **Yes.**

4   Q.   And that is one of the things that you've already testified

04:25  5   to that you tried to do, right?

6   A.   **I didn't -- wasn't connected to the internet, no.**

7   Q.   Well, but wasn't he asked what the password was to the

8   internet?

9   A.   **Not to the internet; to the wallet.**

04:25  10  Q.   Oh, to the wallet?

11  A.   **Yes.**

12  Q.   And then if he had the -- when you had that password, then

13  you would be able to go onto the internet and to transfer the

14  money?

04:25  15  A.   **I would not have to go to the internet to transfer the**

16  **money on his computer.  I could do it from another computer.**

17  Q.   Because you would have had the Bitcoin identifications,

18  correct?

19  A.   **Yes.**

04:26  20  Q.   And because you would have had his password, so it would

21  have looked like Mr. Vallerius was transferring the Bitcoin

22  when in reality it would have been you?

23  A.   **What do you mean by looked like?  To whom?**

24  Q.   Well, if anyone was looking at the transaction, right, it

04:26  25  would appear that the owner of the Bitcoin was transferring it

1  to another location?

2  A.  **I mean, I'm not sure -- I'm not sure that what means the**

3  **owner of the Bitcoin.**

4  Q.  Let me make it easier.  Anyone who had the password and

04:26  5  access to the Bitcoin identification code or numbers -- do you

6  know what I'm talking about when I say the code or numbers, the

7  whole string of stuff?

8  A.  **Yeah.  Receipt.**

9  Q.  Now, you need to have the passwords for that, and you need

04:27 10  to have those numbers in order to transfer it to another

11  location, correct?

12  A.  **Yes.**

13  Q.  And what you have just testified to is that you had the

14  passcode, you had the information, the -- what do they call

04:27 15  those things?

16  A.  **The private seed.**

17  Q.  The private seed?

18  A.  **Yes.**

19  Q.  That you had those so that you were able to then transfer

04:27 20  from the laptop, or wherever it was, to an account that you

21  chose, correct?

22  A.  **Not exactly.  It wouldn't be from the laptop.  I was -- I**

23  **was able to -- if I had the seed, I was able to recreate**

24  **Mr. Vallerius' wallet on a government computer and transfer it**

04:28 25  **out to another wallet.**

```
 1  Q.  So it would look like it was his wallet, and it was his
 2  wallet; it's just that now you were controlling it?
 3  A.  That's correct.
 4  Q.  So in essence, you took his wallet or copied his wallet,
 5  whatever is the correct term, but it would be his wallet that
 6  looks like it's actually using to transfer the funds, correct?
 7  A.  That's correct.
 8          MR. NATALE:  Nothing further.  Thank you, Agent.
 9          THE COURT:  Any questions?
10          MS. ALDEN-PELKER:  Briefly, Your Honor.
11
12                     CROSS EXAMINATION
13  BY MS. ALDEN-PELKER:
14  Q.  Agent Infante, your investigation into Dream Market
15  involves other agencies; is that correct?
16  A.  That's correct.
17  Q.  And is HSI one of those other agencies?
18  A.  Yes.
19          THE INTERPRETER:  A little louder, please.
20  BY MS. ALDEN-PELKER:
21  Q.  Is HSI one of those other agencies?
22  A.  Yes.
23  Q.  And in your investigation into the Dream Market, your
24  investigation included investigation into the people who are
25  actually running it; is that correct?
```

04:28  5
04:28  10
04:28  15
04:29  20
04:29  25

```
        1  A.   Yes, that's correct.
        2  Q.   And who did you identify as one of the individuals running
        3  the marketplace?
        4  A.   "OxyMonster" was one of the individuals that was at some
04:29   5  point a senior moderator and possibly an administrator of Dream
        6  Market.
        7  Q.   And defense counsel asked you about syntax that you were
        8  able to compare.  Did you compare the syntax of "OxyMonster"
        9  with Mr. Vallerius' posts?
04:29  10  A.   Yes.
       11  Q.   Did you also do other things to connect "OxyMonster" to
       12  Mr. Vallerius?
       13  A.   Yes.
       14            THE INTERPRETER:  I apologize.  I apologize.  I
04:30  15  couldn't hear you.  I couldn't hear the question.  I'm sorry.
       16  BY MS. ALDEN-PELKER:
       17  Q.   I'll restate.  Did you do other things to also connect
       18  "OxyMonster", the Dream Market moderator, to the defendant?
       19  A.   Yes.
04:30  20  Q.   And did that include reviewing the vendor profile of
       21  "OxyMonster"?
       22  A.   Yes.
       23  Q.   Did that also include reviewing the forum posts of
       24  "OxyMonster"?
04:30  25  A.   Yes.
```

1  Q.   And what did you see on the "OxyMonster" vendor profile?

2  A.   **I saw -- well, first of all, he was selling oxycodone and**

3  **Adderall.**

4       **And in the profile description, he mentioned an**

04:30  5  **official Dream Market tip jar, which was a Bitcoin wallet that**

6  **started with one dream, and it was used to -- for the staff of**

7  **Dream Market to receive tips from the users of Dream Market.**

8  Q.   Did "OxyMonster"'s vendor profile also include a way to

9  send him messages or a way to encrypt messages to be sent to

04:31 10  him?

11 A.   **Yes.**

12 Q.   And what was that?

13 A.   **It was the public PGP key that he used to communicate.**

14 Q.   So if you are a user on Dream Market and you wanted to send

04:31 15  a message to "OxyMonster", how would you use that PGP key?

16 A.   **He had his public key on his profile.  I would take his**

17 **public key.  I would put it into a PGP client, similar to the**

18 **one that we saw today, and I would write out a message, and I**

19 **would use that PGP client and Mr. Vallerius' public PGP key to**

04:31 20  **encrypt my message.  When the message is encrypted, it looks**

21 **like hundreds of random letters and numbers, a bunch of**

22 **gibberish which only Mr. Vallerius can decrypt because he is**

23 **the one that possesses the private key to decrypt that message.**

24 Q.   So when you send this message that just looks like random

04:32 25  letters and numbers and characters, the only way that you can

1  decrypt that message to read it is if you have the private PGP

2  key?

3  A.  **Yes, that's correct.**

4  Q.  And in your investigation of "OxyMonster", did you also

04:32  5  review his posts on the Dream Market forum?

6  A.  **Yes.**

7  Q.  And did any of those posts connect "OxyMonster" to the

8  administration of free market?

9  A.  **Yes.  "OxyMonster" was listed as a senior moderator on**

04:32  10  **Dream Market.  He also had over a thousand posts replying to**

11  **disputes and complaints of customers.  And in addition, in his**

12  **signature, in his forum profile he had the Dream tip jar, the**

13  **same one that he used in his Dream Market vendor profile.**

14  Q.  The Dream Market tip jar what was that?

04:33  15  A.  **The tip jar was just a wallet address, Bitcoin wallet**

16  **address that Mr. Vallerius used to receive small amounts of**

17  **Bitcoin from users if they wanted to thank him for doing a**

18  **great job.**

19  Q.  And were you able to track the Bitcoin transactions

04:33  20  associated with that bit jar?

21  A.  **Yes.**

22  Q.  Did you get information about who actually controlled that

23  account that was linked to that Bitcoin address?

24  A.  **Yes.**

04:33  25  Q.  And who did control that account?

1  A.  **Mr. Vallerius.**

2  Q.  And did you get information that it was actually Gal

3  Vallerius from France who controlled that account?

4  A.  **Yes.**

04:33  5  Q.  Drawing your attention to August 31st of 2017, where were

6  you that day?

7  A.  **In the morning I was at the Atlanta International Airport**

8  **waiting for Mr. Vallerius to arrive, with CBP and HSI agents.**

9  Q.  And when you went to the airport, had you already made a

04:34  10  decision to arrest Mr. Vallerius?

11  A.  **No.**

12  Q.  And, in fact, did you have contingency plans in place if he

13  continued from the airport into the United States?

14       THE INTERPRETER:  I'm sorry.  The interpreter missed

04:34  15  the question.

16  BY MS. ALDEN-PELKER:

17  Q.  Did you, in fact, have contingency plans in place if

18  Mr. Vallerius continued into the United States onto his

19  destination?

04:34  20  A.  **Yes.**

21  Q.  Agent Infante, you've testified that it isn't illegal to

22  have Bitcoin, correct?

23  A.  **Yes.**

24  Q.  But if you're reviewing a target's device and you find a

04:34  25  Bitcoin address that's been tied to drug-trafficking activity,

1  is that, in fact, evidence?

2  A.  **Yes, absolutely.**

3  Q.  And is that, in fact, what you found on the defendant's

4  laptop when you reviewed it?

04:34  5  A.  **Yes.**

6  Q.  And it's not illegal to have a PGP key; is that correct?

7  A.  **That's correct.**

8  Q.  Even a PGP key that is the only way you can decrypt

9  messages?

04:35  10  A.  **Right.**

11  Q.  But it can be evidence if that PGP key is found on a device

12  where you know that that PGP key is tied to a vendor or

13  administrator on an internet-based drug-trafficking site; is

14  that correct?

04:35  15  A.  **Yes.  That's correct.**

16       **MS. ALDEN-PELKER:**  Court's indulgence?

17       **THE INTERPRETER:**  The interpreter missed the last

18  phrase.

19  **BY MS. ALDEN-PELKER:**

04:35  20  Q.  Agent Infante, you're familiar with investigations

21  involving criminals who use the internet to commit

22  drug-trafficking offenses, correct?

23  A.  **Yes.**

24  Q.  And their use of electronic devices?

04:35  25  A.  **Yes.**

1  Q.   And it sometimes can be difficult if someone is using

2  anonymous services like the dark net to know the exact device

3  that they are using; is that correct?

4  A.   **Yes, that's correct?**

04:36  5  Q.   And unless you can reach through the computer and grab the

6  serial number, you may not know the serial number of the laptop

7  that they're using, for example?

8  A.   **That's correct.**

9  Q.   Are you familiar generally with how dark net vendors and

04:36  10  users use their electronic devices in furtherance of the

11  criminal activity?

12  A.   **Yes.**

13  Q.   And do dark net market vendors typically need to have their

14  devices with them to, say, respond to orders quickly?

04:36  15  A.   **Yes.**

16       **THE INTERPRETER:**  Can you repeat the question, please?

17  **BY MS. ALDEN-PELKER:**

18  Q.   Do dark net vendors typically need to have access to their

19  electronic devices in order to continue their criminal

04:36  20  activity?

21  A.   **Yes.**

22  Q.   Now, Agent Infante -- I apologize, I'm not sure whether

23  it's defense Exhibit 1 or 2 was the -- referring to the search

24  warrant that was --

04:36  25       **MR. NATALE:**  Search warrant was government's

1  Exhibit -- no.  Defense Exhibit 1.

2  **BY MS. ALDEN-PELKER:**

3  Q.   Defense Exhibit 1, the search warrant, you testified you

4  didn't -- you weren't the affiant on the search warrant; is

04:37  5  that correct?

6  A.   **That's correct.**

7  Q.   But you are familiar with the search warrant?

8  A.   **Yes.**

9  Q.   And you're familiar with the probable cause that was set

04:37  10  forth in the search warrant?

11  A.   **Yes.**

12  Q.   And that lays out in detail all of the investigation into

13  "OxyMonster" and Mr. Vallerius?

14  A.   **Yes.**

04:37  15  Q.   And you're familiar, in fact, there are only a single

16  paragraph describing the outcome of the border search?

17  A.   **Yes.**

18  Q.   And when you conducted the border search, to be clear --

19       **THE INTERPRETER:**  Can we slow down the questioning,

04:37  20  please?

21  **BY MS. ALDEN-PELKER:**

22  Q.   To be clear, when you conducted the border search, you

23  didn't have any advanced forensic tools with you to do so; is

24  that correct?

04:37  25  A.   **That's correct.**

```
 1   Q.   In fact, you open a laptop and you looked at the desktop?
 2   A.   Yes.
 3   Q.   And you selected icons that were right there on the desktop
 4   for review?
 5   A.   Yes.
 6   Q.   You didn't do any sort of in-depth review into the file
 7   structure?
 8   A.   No.
 9   Q.   And when you had done your very-preliminary use of what was
10   on the desktop, you went, and it was determined that you would
11   get a search warrant; is that correct?
12   A.   Yes, that's correct.
13   Q.   And you did, in fact, go and get a search warrant?
14   A.   Yes.
15        MS. ALDEN-PELKER:  Court's indulgence.  No further
16   questions.
17        THE COURT:  Any redirect?
18
19                    REDIRECT EXAMINATION
20   BY MR. NATALE:
21   Q.   Agent Infante, you would agree that there was no intent to
22   arrest Mr. Vallerius upon his arrival in the United States?
23   A.   Yes.
24   Q.   And that it was only after you discovered what was
25   discovered on the computer that the decision was made to arrest
```

```
     1  him?

     2  A.   Yes, that's correct.

     3  Q.   And the -- just so it's clear to the Court, you go from the

     4  desktop to these icons, and then you open the icons, and you

04:39 5  get to another level, right?

     6  A.   What do you mean another level?

     7  Q.   Well, you find out what's behind the icon, right?

     8  A.   Yes.

     9  Q.   Because if you just look at it, you've got no idea?

04:39 10 A.   Right.

    11  Q.   So you go into or behind the icon to open that folder,

    12  correct?

    13  A.   Right.

    14  Q.   And then once you open that folder, you're able to get

04:39 15 additional information, right?

    16  A.   Right.

    17  Q.   Which you otherwise wouldn't have?

    18  A.   Yes, that's correct.

    19  Q.   And that additional information can direct you to other

04:40 20 places, correct?

    21  A.   Yes.

    22  Q.   Which allows you then to make the connection between what

    23  was your continuous and ongoing investigation and the specific

    24  information in this device, that is, the laptop to

04:40 25 Mr. Vallerius and to give you the probable cause in order to
```

 1  arrest him, right?

 2  A.   **That was just one of the pieces of the probable cause.**

 3  Q.   Well, when we look at the affidavit in support of the

 4  search warrant in the complaint, I think as the prosecution

04:40  5  just pointed out, there's only one paragraph difference as far

 6  as new information, and that was what happened when you

 7  searched the computer.  Prior to that it's everything you knew

 8  before that, right?

 9  A.   **Yes.**

04:41 10  Q.   And that the only thing that was added that was new was the

11  information gotten from the computer which provided the

12  specific link that this particular electronic device and

13  subsequently the phones were connected to the illegal activity

14  that you are investigating, right?

04:41 15  A.   **Yes.**

16  Q.   And as a result connected to Mr. Vallerius, right?

17  A.   **Yes.  One of the few points that connected him to the**

18  **criminal activity, yes.**

19  Q.   Well, I'm not talking about the criminal activity?

04:41 20  A.   **Right.**

21  Q.   You had -- I'm talking these devices.  What connected these

22  devices to Mr. Vallerius was what you discovered through your

23  search of the computer and the phones, right?

24  A.   **Yes, that's correct.**

04:42 25  Q.   And that was pretty much contained in a single paragraph in

1   order to get the search warrant, correct?

2   A.   **Yes.**

3   Q.   And everything else was what you already knew?

4   A.   **Yes.**

04:42  5         **MR. NATALE:**  I have no further questions.

6         **THE COURT:**  Thank you.  You may step down carefully.

7   All right.  Any additional witnesses from the defendant?

8         **MR. NATALE:**  No, Your Honor.

9         **THE COURT:**  Any additional witnesses from the

04:42  10  government?

11        **MS. ALDEN-PELKER:**  No, Your Honor.

12        **THE COURT:**  All right.  The evidentiary phase of the

13  hearing is closed.  Does anybody want to argue anything?

14        **MS. KRASNOFF:**  Yes.

04:42  15

16                ***CLOSING ARGUMENT***

17        **MS. KRASNOFF:**  So I think the first thing that's

18  important is to draw the Court's attention to some specific

19  information and important facts that we now know from the

04:43  20  testimony.

21        One, we know that prior to Mr. Vallerius getting to

22  the United States, there was a very high level of suspicion

23  regarding his connection to criminal activity but zero

24  connection to the laptops, meaning the criminal activity to the

04:43  25  laptops.

1          We know that when Mr. Vallerius got here, he was taken

2    to secondary because he was a target of the DEA, not because

3    his passport was expired or because this was a random search.

4    There was a flag in his file saying we need to stop him, and we

04:43  5    need to look at his information.

6          We know that Mr. Vallerius was told that they're

7    looking for criminal activity, as an example, child

8    pornography, and also we know that's not true; that they

9    weren't looking for child pornography.  I believe Agent Infante

04:44 10    specifically said she didn't look in any area of the laptop for

11    the purpose of finding child pornography; she was looking to

12    find a connection to the Dream Market and to the narcotics

13    charges.

14          We know that it was only after Mr. Vallerius was

04:44 15    separated from his wife and put into a separate room that he

16    was read Miranda, and that it was not read prior to that, but

17    we also know that Mr. Vallerius was not free to leave at any

18    point.  He certainly couldn't have left secondary inspection.

19    He certainly couldn't have gone back on a plane.  I think that

04:44 20    Agent Lewis made that very clear; that there were agents in the

21    room making sure he would not leave, and if he had tried to, he

22    would have been stopped.

23          We know that a day after Mr. Vallerius was stopped, an

24    affidavit for a search warrant was submitted, and everything up

04:44 25    to paragraph 46 contained information that they had prior to

1   Mr. Vallerius getting there, which was not information

2   submitted before he arrived, before they opened the computer

3   because paragraph 46 created the nexus between what they wanted

4   to search.

04:45   5        And of course, an arrest warrant is quite different

6   from a search warrant in that they need a nexus between what

7   they want to search, whether it's a house or a device, to what

8   their suspicion is --

9        THE INTERPRETER:  Can you please slow down from the

04:45   10   nexus and repeat it?

11        MS. KRASNOFF:  Yes.

12        THE COURT:  Slow done a bit.

13        MS. KRASNOFF:  They need to believe that there is a

14   reasonable likelihood that they will find evidence of the

04:45   15   criminal activity in the item that they want to search, and

16   that nexus did not exist until they opened the laptop.

17        So if I get to points in the argument that are

18   repetitive from the motion, just tell me to keep going, but I

19   want to make sure I highlight what I believe are the important

04:45   20   parts.

21        THE COURT:  So what difference does any of that make

22   though?

23        MS. KRASNOFF:  Well, I think it goes -- if I could

24   start with the Fifth Amendment.

04:45   25        So the officer -- the agents want us to say to believe

1  that every person that comes through secondary is being

2  subjected to a routine border search and that there is no

3  border search that is outside of the routine.

4  But that would mean -- the logical consequences of

04:46  5  that is that the constitution gets thrown out at the border and

6  that there is no time where the Fifth Amendment gets implicated

7  or the Fourth Amendment gets implicated, and we know that

8  that's not the case.

9  And our position is that when a person is a target of

04:46  10  an investigation, when they're arriving in the United States,

11  and there is a plan in place to use HSI, to use border security

12  to some extent as a pretext and to target them, which is what

13  happened here, that that does implicate the Fifth Amendment

14  because they're not asking questions like where are you coming

04:46  15  from, what supports this visa, information like that.  This is

16  the same as if he was the target in the United States of a

17  criminal investigation, and they want to end-run around the

18  Fifth Amendment by saying this was a routine border search.

19  THE COURT:  But hasn't the 11th Circuit also rejected

04:47  20  that precise argument in Moya and the Padilla case?  I mean, we

21  know --

22  THE INTERPRETER:  The interpreter can't hear.

23  THE COURT:  Sorry.  Hasn't the 11th Circuit rejected

24  that both in Moya and in Jayyousi already?  In other words, the

04:47  25  argument being that if a person is a target, that somehow

1  changes the analysis?

2         MS. KRASNOFF:  Well, I think the question -- what we

3  need to look at is what is being asked.  So being a target and

4  being stopped doesn't automatically trigger that.  I believe

04:47  5  that at the border you can be stopped, you can be searched.

6  The question is what are they asking?  Is it related to their

7  investigation?  Is it related to their targeted activity?  Is

8  it related to the criminal activity?

9         THE COURT:  Right.

04:48 10         MS. KRASNOFF:  And if so, then the Fifth Amendment is

11  triggered.

12         THE COURT:  But clearly Jayyousi does not stand for

13  that proposition.

14         MS. KRASNOFF:  I think Jayyousi was --

04:48 15         THE COURT:  They suspected him of being a terrorist.

16         MS. KRASNOFF:  And they held him for too long, and so

17  the question was in the length of how long they were holding

18  him --

19         THE COURT:  Right.  In fact, far more egregious than

04:48 20  this.  They held him for quite some time in what was clearly an

21  interrogation, but the 11th Circuit held that it was only until

22  the point in time when the questions began to be directly

23  accusatory did the permissible border inquiry end and the Fifth

24  Amendment Miranda began.

04:48 25         Here, based upon the record presented, there's no

record of any accusatory questions made to the defendant, not

one.  And clearly the initial question of, you know, give me

your laptop and your password, for Fifth Amendment purposes

clearly doesn't rise to the level of an accusatory question.

04:49  Would you agree with that?

**MS. KRASNOFF:**  I don't agree with that, Your Honor.

**THE COURT:**  How so?

**MS. KRASNOFF:**  So -- well, first I think that --

**THE COURT:**  So if I -- so just to carry that to its

04:49  logical extreme.  Same facts except instead of this individual,

it's me with my iPad.  Same facts.  I go to secondary.  I'm

excluded.  My bags are searched.  I'm asked do you have any

electronic devices?  I say, yes, I do; I have an iPad.  Give

the iPad to me, says the agent.  I give him the iPad.  And he

04:49  asks, what's the code to open it?  And I say under command of

authority, one, two, three, four.

Are you seriously suggesting that in that situation, a

Fifth Amendment violation has occurred?

**MS. KRASNOFF:**  No, because they don't have separate

04:50  information making you a target of the investigation.

**THE COURT:**  Correct.  The line that you're drawing is

they don't suspect me of anything.

**MS. KRASNOFF:**  They don't suspect you of anything, and

they're not looking for very specific information in the device

04:50  that they want to search.

1          THE COURT:  In other words, they don't have a motive;

2    they don't already have a preexisting suspicion.

3          MS. KRASNOFF:  Correct.

4          THE COURT:  So your analysis is that if there's a

04:50  5    preexisting suspicion, that changes the analysis; isn't that

6    correct?

7          MS. KRASNOFF:  That's our position.

8          THE COURT:  Hasn't Jayyousi stand for the opposite

9    proposition?

04:50  10         MS. KRASNOFF:  I think that the facts were to some

11   extent, distinguishable.  I think that there were different

12   questions in the sense of how long was Jayyousi being held --

13         THE COURT:  But if I did a table of the types of

14   questions asked in Jayyousi versus give me your laptop and your

04:50  15   password, would you agree that what was going on in Jayyousi

16   was far more accusatory than give me your password, right?

17         MR. NATALE:  Your Honor, if I may, I litigated --

18         THE COURT:  She's doing a fine job.

19         MR. NATALE:  I understand, but I just want to tell you

04:51  20   about Jayyousi.

21         THE COURT:  Fine.

22         MS. KRASNOFF:  What happened is he was arrested -- he

23   was arrested on a material witness warrant, so he was under

24   arrest.

04:51  25         THE COURT:  So why doesn't that even make it worse?

1    He was already under arrest, but the 11th Circuit found that

2    because he was at a border, until the level of questioning rose

3    to the accusatory level that they ultimately found at a later

4    stage, but at the initial stage, not only was he suspected of

04:51  5    being a terrorist; he was actually under arrest, immediately.

6        But yet the 11th Circuit found -- I don't think he

7    helped you.  See?  You should have just -- (laughter) -- the

8    11th Circuit found that there was no Fifth Amendment violation

9    at that stage.

04:51  10       MR. NATALE:  But see, he wasn't arrested up for a

11   crime.  He was arrested as material witness.

12       THE COURT:  I know that.

13       MR. NATALE:  So there was no criminal -- it didn't

14   trigger that there was a crime that they were investigating.

04:52  15   He was already under arrest as a material witness, and we know

16   that material witnesses oftentimes are not charged.

17       THE COURT:  But don't you think that if I'm being

18   arrested, even as a material witness my Fifth Amendment rights

19   are higher at that point?  Wouldn't you agree?

04:52  20       MR. NATALE:  (Shaking head)

21       THE COURT:  You don't agree with that?

22       MR. NATALE:  No, Your Honor.

23       THE COURT:  Well, I think they are, but even in that

24   situation the 11th Circuit found that there was no Fifth

04:52  25   Amendment violation because of the analysis in Moya that

1   requires, as a predicate, accusatory questions.

2       So I understand you have a job to do.  Your argument

3   is that because they suspected him of being involved in this --

4   which I still don't understand, but whatever it is -- this

04:52   5   narcotics operation, and they knew it, the question which is

6   otherwise innocuous, give me your password, do you have a

7   device, you construe that to be accusatory questioning for

8   purposes of Miranda because of their preexisting knowledge.  Is

9   that your argument?

04:53  10       MS. KRASNOFF:  Yes, Your Honor.

11       THE COURT:  Any other argument on that that you want

12   to raise on the amendment issue?

13       MS. KRASNOFF:  Not on the amendment --

14       THE COURT:  Have I encapsulated?

04:53  15       MS. KRASNOFF:  Yes, that the agent's intent here

16   matters and it changes what would be an innocuous question into

17   an accusatory question to someone who was not a material

18   witness but was a suspect in a criminal investigation.

19       THE COURT:  Okay.  So now let's carry this forward.

04:53  20   Let's assume that I think that under Moya and Jayyousi and

21   actually preexisting law -- but those are the most recent

22   applications of it that I have in front of me -- that your

23   Fifth Amendment argument fails, that there was no Fifth

24   Amendment issue, there was no custodial interrogation at that

04:53  25   point, the questions were not accusatory; therefore, Miranda

was not required; the defendant confers information that they

then use to open the device and conduct a search.

Is there anything left of your motion if I make that

conclusion?

04:54   **MS. KRASNOFF:**  I believe there is.

**THE COURT:**  Okay.  What would that be?

**MS. KRASNOFF:**  So Miranda -- we put Miranda to the

side completely.  So now what we're left with is a laptop, and

I think we covered this a little bit at the beginning of the

04:54  motion, but only two ways to get in.  Either he says this is

the password, and that is implied consent because he's giving

them the password in order to get in.  Or like the agent said

many people do, he says, I'm not giving you the password.  And

then we know what the consequences of that are which is the

04:54  agents want -- my position is they would go get a search

warrant, and they would then force -- and I think there's clear

-- not so clear, but there's Ninth Circuit case law that would

then command Mr. Vallerius to give the password, but they

didn't do that.

04:55  **THE COURT:**  I was just going to ask you before we get

to that.  What authority is there on this narrow issue?

**MS. KRASNOFF:**  I don't think there is from the 11th

Circuit.  I think that --

**THE COURT:**  What did the Ninth Circuit hold?

04:55  **MS. KRASNOFF:**  The Ninth Circuit held that if there is

1    a search warrant, you could force a defendant to give the

2    password.

3            THE COURT:  With a search warrant?

4            MS. KRASNOFF:  With a search warrant.  That is the

04:55  5    only case I read that was on this issue about when you can

6    force somebody to give a password.

7            THE COURT:  I could have sworn I heard -- I have a

8    vague recollection of an appellate court case dealing with the

9    customs requirement to confer that information as a facial

04:55 10    matter; is there not?  With all this Trump litigation going on,

11    it's hard to keep it all in track.

12            MS. KRASNOFF:  I do not.  I haven't seen anything, but

13    I wouldn't say it doesn't exist.

14            THE COURT:  But you're not familiar -- you can't tell

04:55 15    me there isn't one?

16            MS. KRASNOFF:  I can't tell you there isn't one.  I

17    can tell you what I found was a recent Ninth Circuit opinion.

18            THE COURT:  But that opinion dealt with whether or

19    not, in course of the issuing the search warrant, they can

04:56 20    compel that.

21            MS. KRASNOFF:  Once the search warrant was issued.

22            THE COURT:  Right.  To enforce the search warrant.

23            MS. KRASNOFF:  Right.  So I think one thing that they

24    could have done is gone to get a search warrant at that point

04:56 25    and then compelled the password.

1      THE COURT:  Well, let me ask you this question.  Going

2  back to my example with my iPad.  Is there a -- same facts as I

3  indicated earlier.  They ask for the password.  I confer it

4  because under submission of authority.  We all agree to that.

04:56  5      MS. KRASNOFF:  Right.

6      THE COURT:  And then they search my iPad.  Under your

7  argument, is that a Fourth Amendment violation?

8      MS. KRASNOFF:  Well, that's basically where we are

9  now.  And so the question has to be, is there a Fourth -- is

04:56 10 the Fourth Amendment implicated?

11      Our position is yes.  Certainly we agree at a lower

12 level, but there's still a reasonableness question.  Right?

13 And so I think we still have to evaluate the consent and

14 whether it was true consent.

04:57 15     THE COURT:  It's submission to authority, I think, in

16 that situation.

17      MS. KRASNOFF:  And not -- but I think there's a

18 difference between submission to authority and somebody who

19 understands exactly what's going on.  They've seen this before.

04:57 20 They haven't been lied to.  I think there are factors here

21 beyond submission to authority that come into play to determine

22 whether or not this consent was valid.

23      THE COURT:  Well, I guess to some extent, there's

24 the -- before we get to -- consent is an exception to the

04:57 25 warrantless issue.

1          **MS. KRASNOFF:**  Right.

2          **THE COURT:**  The predicate here is -- the government's

3    argument is we don't ever get to consent because the

4    requirement to obtain a warrant or something else or to get

04:57  5    consent is not a predicate.  They simply could have done it on

6    submission of authority at the border because the border search

7    exception allows that, just as it does if the person comes in

8    with a piece of luggage, right?  And say it was filled with all

9    of my mother's food that she used to bring in from Bolivia, and

04:58  10   the customs tells her, I would like to inspect your luggage,

11   and then she says no.  Right?

12         **MS. KRASNOFF:**  Right.

13         **THE COURT:**  Could they search it anyway and find all

14   the ham that she brought in?  Under your theory, just so I

04:58  15   understand it, that's a Fourth Amendment violation.  Isn't that

16   what you're saying?

17         **MS. KRASNOFF:**  No.  We know that there's a distinction

18   between laptops and bags, right?  Bags can hold a finite amount

19   of content or information.

04:58  20         **THE COURT:**  It's a container.

21         **MS. KRASNOFF:**  Laptops are -- well, but the Supreme

22   Court has drawn a distinction and said, if there's a laptop you

23   would need a warrant in cases where you might not for a bag.

24   The search incident to arrest, you don't just get to go in.

04:58  25         **THE COURT:**  But clearly all courts, including the

1  Supreme Court recognize that fundamentally a laptop is a

2  container.  Now, it contains a lot of information, much more

3  than my mother's luggage, but it's a container.

4       **MS. KRASNOFF:**  So here's what would have happened with

04:59   5  your mother's bag; they would have just gone in.

6       **THE COURT:**  Would she have sued?

7       **MS. KRASNOFF:**  And here's what would have happened to

8  Mr. Vallerius.  They would have taken his laptop, and they

9  would have sent it to a lab, and they would have done

04:59  10  everything they could do to break into it, but nobody could say

11  they would have been successful in doing that.  Right?  If

12  somebody could come in and say, here is how we would have

13  gotten into it if he hadn't given us the password, then maybe

14  we have some sort of inevitable discovery issue, and the Fourth

04:59  15  Amendment violation might not matter, but that's not what

16  happened.  He gives the password, right?  So the agents have

17  said exactly what would happen; instead of searching your mom's

18  bag at the airport, they would send it to a lab and do

19  everything they could to break into it.

04:59  20       **THE COURT:**  Well, let's take example.  They don't send

21  it to a lab.  They take a knife and pry it open.  Is that a

22  Fourth Amendment violation?

23       **MS. KRASNOFF:**  I don't think -- I think that there's

24  the -- there are a couple of ways that we get past the Fourth

05:00  25  Amendment.  One is to go get a search warrant; one is consent.

1          THE COURT:  They got no consent; she said no.  They

2    took a knife and they pried it open.  Is that a Fourth

3    Amendment violation?

4          MS. KRASNOFF:  Not necessarily.

05:00   5          THE COURT:  Why not?

6          MS. KRASNOFF:  Because we know that they -- well, in

7    your scenario, we know they can get into the bag.  We don't

8    know that they can get into the laptop without one of those two

9    ways.  They want us to believe that eventually they would have

05:00  10   gotten in anyway.

11         THE COURT:  So then, just so I understand your

12   argument, the hinge, for purposes of -- you're saying they

13   don't commit a violation if they forcibly, with use of force,

14   break open a piece of luggage, right?  But they do commit a

05:00  15   violation if they don't do that but then go back later and

16   figure out how to do it.  Is that what you're saying?

17         MS. KRASNOFF:  I just say we can't pick the way that

18   -- we have to go down the path that are the facts of this case.

19   Right?  And they didn't do the -- what would be like breaking

05:01  20   open the lock, which would be sending it to the lab.  That's

21   not the route they picked.  So if instead of asking him for the

22   password, they said, we don't need your password; this is ours;

23   we get to keep it.  That would be the end.

24         But since he gave the password and that gave them the

05:01  25   ability to get in, then our position is that the Fourth

1   Amendment is implicated at that point.

2           THE COURT:  But isn't that a Fifth Amendment issue,

3   not a Fourth Amendment issue?

4           MS. KRASNOFF:  I think it's a waiver issue, a waiver

05:01   5   of the Fourth Amendment if the Fourth Amendment --

6           THE COURT:  Here is the problem that I have with that.

7   Say he didn't give the password, and then the guy opened up the

8   laptop, the person searching the laptop, and typed in his name.

9   Right?  Just on a lark.  You know, some people put password as

05:01  10   their password.  Let's say he did that, so no consent, right?

11  No warrant.  Password, it worked.  They opened it just like the

12  guy with the knife with the luggage, opened it.  Fourth

13  Amendment violation?  Are you saying that's not a Fourth

14  Amendment violation then?

05:02  15          MS. KRASNOFF:  I don't think that is.  I just don't

16  think those are the facts of this case.  I think that the way

17  they went about getting into the computer was essentially to

18  ask for consent, and that when they did that --

19          THE COURT:  You realize that makes no sense, right?

05:02  20  In other words, if you're telling me that's not a Fourth

21  Amendment violation where they don't get a consent, they don't

22  have it, they just do it on a lark, and then they open it

23  without his consent, without a warrant, you're agreeing with me

24  under the border search exception, that's perfectly valid.

05:02  25          MS. KRASNOFF:  I think there's still a reasonableness

1    question.  And so I think that's where the Fourth Amendment

2    comes in is what was reasonable.

3              THE COURT:  Let me ask you this question.  Why is it

4    unreasonable to ask a person -- well, we don't know if he read

05:02   5    the form, right?

6              MS. KRASNOFF:  Right.

7              THE COURT:  So I think a reasonable person would

8    assume that if they don't give consent, they'll either try to

9    hack in, or they'll expel me, or at the very least they'll take

05:02  10    it, right?  Isn't that correct?

11              MS. KRASNOFF:  I think so.

12              THE COURT:  So why isn't it reasonable then for the

13    government to request that for Fourth Amendment purposes and

14    see what the defendant does?  In this case, the defendant was

05:03  15    told we're going to search through for evidence of criminal

16    activity.

17              Now, he was told -- he wasn't told about the drugs,

18    but he was told about criminal activity.  I think you

19    established that the example given was if he had child born.

05:03  20    So he was actually told that the purpose of their search is not

21    just because they want to look at his pictures they actually

22    want to receive if he's a criminal.  He conferred the

23    information.  How is that unreasonable?

24              MS. KRASNOFF:  Well, everyone is probably likely,

05:03  25    especially somebody unfamiliar with the system, to think I

1    submit to authority.  But the agent told us that he explained

2    what would happen if you don't.  And so there's additional

3    pressure being put on him to not allow that to happen to

4    basically say this is inevitable.

05:04  5         THE COURT:  But what makes that unreasonable?

6         MS. KRASNOFF:  Well, what makes it unreasonable in

7    this particular case is they used trickery to get the password

8    from him by telling him that we're going to be searching for

9    child pornography.  He believed that their search would be

05:04 10   limited in scope to where child pornography might be, like a

11   peer-to-peer website or his downloads or something like that.

12   And certainly the search went beyond that.

13         He's also somebody who is unfamiliar with his rights

14   here.  He's not familiar with the Fourth Amendment.  He's not

05:04 15   familiar with the ability to say no.  And then whatever the

16   consequences might be after that, maybe there is a Fourth

17   Amendment violation, maybe there isn't, but the question here

18   is, is there a Fourth Amendment violation when the way they go

19   about it is by asking for consent.

05:04 20        And our position is this consent was not knowing and

21   voluntary and so, had they gone about it a different way, we

22   might not be here, but this is the way they went about it.

23         THE COURT:  So basically what you're saying is even

24   though they would have had the right -- if they didn't ask him

05:05 25   any questions, they would have had the right to hack into it

1   without violating the Fourth Amendment.

2          If they decide not to hack into it and ask for

3   assistance, then the Fourth Amendment is triggered, is what

4   you're saying; that's the line of demarcation.

05:05  5          MS. KRASNOFF:  My position before Vergara was that

6   they couldn't then take it and hack it.  I think Vergara says

7   that they can.  I certainly think that was wrongly decided.

8          I think Breyer's dissent is more correct, which is a

9   cursory search at the border might not require more than --

05:05 10   might not require a warrant but that taking the laptop,

11   removing it, and doing -- and extracting material, including

12   breaking into it to get the password, our position is that

13   Vergara was wrongly decided, and that it does require a warrant

14   to actually take it and leave the airport.

05:05 15          THE COURT:  Now, how does that make any sense as well,

16   because if you concede that the Supreme Court has held that to

17   strip search and body cavity somebody at the border you don't

18   require a warrant and you don't even require probable cause;

19   you only require reasonable suspicion.  Is that correct?

05:06 20          MS. KRASNOFF:  That's correct.

21          THE COURT:  So if that -- can be there be anymore

22   intrusive a search than a body cavity search?

23          MS. KRASNOFF:  Not more intrusive, but in terms of

24   what they're able to search.  So a body is a limited body of

05:06 25   content --

1          **THE COURT:**  They're searching into a body cavity.

2          **MS. KRASNOFF:**  Agreed.  It is exceptionally intrusive,

3    privacy, agreed.  Right?  But there is a limited amount that

4    they can find in a body search; that they have specific

05:06   5    information that this person is a mule; that this person has

6    this on them; and they stand there and they wait, or they go in

7    and they get it.

8          A computer has endless amounts of information, and so

9    it can contain significantly more.  I don't mean to compare a

05:06  10    computer to a body, but in your example, your mom's bag which

11    can only contain a finite amount --

12          **THE COURT:**  I think she would be far more offended by

13    the body cavity search than the computer.

14          **MS. KRASNOFF:**  I agree.  I think I agree and

05:07  15    understand, but I think the difference with a laptop is how

16    much information and so -- and there is the possibility that it

17    includes private health information, private security

18    information, private financial information.

19          **THE COURT:**  There's a lot more that you can gather in

05:07  20    that container, but what's the logic in requiring probable

21    cause for that container and not for a body cavity search?

22          **MS. KRASNOFF:**  I think there is a point where you

23    can't hold somebody to do a cavity search until the end of

24    time, right?  And so I think --

05:07  25          **THE COURT:**  At the border.

1          **MS. KRASNOFF:**  At the border.  And so I think that

2    there is a point where you can't hold a computer forever and do

3    extractions and take it to a forensic lab.

4          **THE COURT:**  Well, that my be right, but here, of

05:07  5    course, we have a border examination, not by a forensic expert

6    but by a DEA agent who's looking to confirm whether or not

7    their suspicion is satisfied.

8          **MS. KRASNOFF:**  But if they hadn't been able to confirm

9    it, if they didn't have the passport, it would have been sent

05:08 10    to a lab.  Right?  And so our position is at that point they

11    would have needed a warrant; to hold the computer for an

12    endless amount of time, not knowing whether or not --

13          **THE COURT:**  But didn't they get a warrant here?  Isn't

14    that also what happened?  Didn't they actually get a warrant?

05:08 15          **MS. KRASNOFF:**  They do, but they only get a warrant

16    because they have a nexus, and they only get that nexus because

17    they went into the computer, and they only get into the

18    computer because Mr. Vallerius provided his password.

19          So I don't know that anybody could represent that they

05:08 20    would have gotten that warrant, if they hadn't gotten into the

21    laptop because they have no nexus for these devices.  I think

22    Agent Infante specifically said we had no reason to believe

23    that these specific devices had anything on them until we

24    opened them.

05:08 25          **THE COURT:**  Okay.  So just to make sure the record is

1  clear as to your position -- because I think you're preserving

2  your arguments here.

3        You acknowledge that Vergara says what it says, and

4  that under Vergara they could have seized the laptop, correct?

05:09  5        MS. KRASNOFF:  Yes.

6        THE COURT:  So your argument is then, the reason you

7  don't lose based on Vergara is because here it's the additional

8  component of having obtained from Mr. Vallerius the password

9  such that they opened it onsite.

05:09  10       MS. KRASNOFF:  They took a path different than the

11  path taken in Vergara.

12       THE COURT:  I think that's a Fifth Amendment argument,

13  but if you want to --

14       MS. KRASNOFF:  We can go back to the Fifth if you

05:09  15  want.

16       THE COURT:  If you want to say that's a Fourth

17  Amendment argument, I guess you can make your argument.

18       MS. KRASNOFF:  I think it implicates both.

19       THE COURT:  I don't think it implicates both because

05:09  20  the predicate is that they needed his consent.  They don't need

21  his consent.  You're agreeing with me that they could open it

22  up, they could hack into it.

23       So if they don't need his consent, the fact that they

24  got it is cream on top for Fourth Amendment purposes, but it

05:09  25  doesn't change the fundamental analysis that the purpose of the

1  border search exception is you don't need a warrant, you don't

2  need consent, you don't need probable cause, you don't need

3  reasonable suspicion to conduct the search of the person who is

4  entering their property and person and effects.

05:10  5       **MS. KRASNOFF:**  I think Your Honor is correct, if

6  Vergara is correctly decided.

7       **THE COURT:**  Right.

8       **MS. KRASNOFF:**  Our position is that Vergara goes one

9  step too far; that you don't need a warrant right at the

05:10 10  border.  I think that's been made very, very clear.

11       **THE COURT:**  Now, Judge Breyer's dissent in that case

12  said, well, at the very least you need reasonable suspicion and

13  at -- in that case that was stipulated, but she went further

14  and said I think you need probable cause and a warrant.

05:10 15       **MS. KRASNOFF:**  Right.

16       **THE COURT:**  Now, let's assume that the 11th Circuit

17  doesn't agree and that the Supreme Court doesn't agree.

18       Do you concede that based upon the information that I

19  have received, that they had at least reasonable suspicion?

05:10 20       **MS. KRASNOFF:**  To suspect Mr. Vallerius of a crime,

21  but not to connect to this particular laptop.

22       **THE COURT:**  Understood.  But in other words, that's

23  all I need --

24       **MS. KRASNOFF:**  Yes.

05:11 25       **THE COURT:**  -- for a reasonable suspicion analysis.

1      **MS. KRASNOFF:**  Yes.

2      **THE COURT:**  All right.  I appreciate that.  Oh, is

3  there any case -- because I'm getting into Moya and all these

4  other things that I think solve this matter.  Is there any case

05:11  5  that supports your position?

6      **MS. KRASNOFF:**  Unfortunately, Vergara came out right

7  after this motion was filed.

8      **THE COURT:**  Somewhat untimely.

9      **MS. KRASNOFF:**  Extraordinarily untimely.  I think

05:11 10  prior to Vergara there was nothing very directly on point.  I

11  concede that Vergara is relatively on point, although I

12  distinguish it because of the password.

13      **THE COURT:**  Right.

14      **MS. KRASNOFF:**  But I did not find anything

05:11 15  different --

16      **THE COURT:**  Right.

17      **MS. KRASNOFF:**  -- than what Vergara says.

18      **THE COURT:**  And you convinced me that Vergara didn't

19  end the inquiry because I do think you have an amendment angle;

05:11 20  that's different.  So I construe that as a Fifth Amendment

21  issue, the strongest part of your argument is the Fifth

22  Amendment issue in my opinion.

23      **MS. KRASNOFF:**  Do you want me to end on that part?

24  Because I like to end on the strongest part.

05:12 25      **THE COURT:**  Sure.  Do you have actually -- on the

1    Fifth -- going back to the Fifth Amendment question, since I

2    don't think Jayyousi and Moya help you, is there anything that

3    does?

4           MS. KRASNOFF:  I don't think there's anything

05:12   5    specifically on point.  I think that we have discussed what --

6    that there would be need to be accusatory nature, and I think

7    that the officers or the agent's intent makes this accusatory

8    and brings it up to that level.  And I also think there's a

9    distinction between having somebody accused of a crime and

05:12   10   somebody who is material.

11          THE COURT:  I will note that Judge Barkett would agree

12   with you.

13          MS. KRASNOFF:  I appreciate that.

14          THE COURT:  Unfortunately, she was in the dissent in

05:12   15   Jayyousi.

16          MS. KRASNOFF:  I find myself in agreement with the

17   dissent often.

18          THE COURT:  You have to do what you have to do in

19   representing your client.  Okay.

05:12   20          Based on the evidence presented then I'll -- I'm bound

21   -- you've preserved your arguments.  I'm bound by Vergara, I'm

22   bound by Jayyousi, and I'm bound by Moya.  So when I combine

23   the three, plus the Supreme Court authority on the definition

24   of border search exception, I find that there's been no Fourth

05:13   25   or Fifth Amendment violation here.

1          And arguably, any Fourth or Fifth Amendment violation

2     may have even been cured by the search warrant, but I'm not

3     going to make that finding.  I'm just going to look at it at

4     face value.

05:13  5          There's no Fifth Amendment violation because under

6     Jayyousi there's been no accusatory questioning initiated, and

7     they're at the border.

8          There's no Fourth Amendment violation because they

9     always have the right to inspect and search and hack into the

05:13 10     laptop without consent.

11          So the manner in which the consent was obtained is

12     really irrelevant, number one.  And number two, in this case I

13     also find that the consent here was not improperly obtained.

14     And number three, to the extent that any additional burden was

05:13 15     required, at most, would be reasonable suspicion post-Riley.

16          I guess I can see that argument, that post-Riley,

17     Judge Breyer's analysis is that you need that, and that was not

18     decided in Vergara.  And I find that reasonable suspicion

19     existed here regardless.

05:14 20          So those are the findings that I will make, and --

21     that I think I'm bound to apply.  But you've preserved your

22     argument for purposes of appeal and for purposes of presenting

23     your argument to a higher authority.  Anything further, then,

24     at this point with respect to our case?

05:14 25          **MR. NATALE:**  Your Honor, are you going to be entering

```
 1  a written order?
 2            THE COURT:  Yeah, no, we'll do a written order.  You
 3  don't have to appeal this because I think we have a little
 4  time.  If we didn't have time, I think I would just leave it at
 5  that, but I believe your calendar call is when?
 6            MR. NATALE:  May.
 7            THE COURTROOM DEPUTY:  Trial is May 22nd.
 8            THE COURT:  So mid-May.
 9            MR. NATALE:  We're fine.
10            THE COURT:  We'll prepare a report and recommendation,
11  and you will have an objection period, and you'll have it in
12  time for that.
13            MR. NATALE:  Thank you, Your Honor.
14            THE COURT:  Thank you very much.
15
16
17
18            (Thereupon, the above hearing was concluded.)
19
20                    *          *          *
21
22
23
24
25
```

1

## C E R T I F I C A T E

2

3      I hereby certify that the foregoing is an accurate

4 transcription of the proceedings in the above-entitled

5 matter.

6

7

8  05/03/2018

9  DATE COMPLETED        GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25